# UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  Richard K. Eaton, Senior Judge**

PT. ASIA PACIFIC FIBERS TBK,

     Plaintiff,

  v.

THE UNITED STATES,

     Defendant,

  and

UNIFI MANUFACTURING, INC.,

  and

NAN YA PLASTICS, CORP.,

     Defendant-Intervenors.

Court No. 22-00007

**PUBLIC VERSION**

---

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>
<u>**IN SUPPORT OF**</u>
<u>**PLAINTIFF'S 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**</u>

Lizbeth R. Levinson
Ronald M. Wisla
Brittney R. Powell

FOX ROTHSCHILD LLP
2020 K Street, N.W.
Suite 500
Washington, DC  20006
Tel: (202) 794-1182
Email: llevinson@foxrothschild.com

*Counsel for Plaintiff PT. Asia Fibers Ptk.*

July 15, 2022

**TABLE OF CONTENTS**

TABLE OF CONTENTS i

TABLE OF AUTHORITIES ii-iv

I. STATEMENTS PURSUANT TO RULE 56.2(c)(2) 1

 A. The Administrative Determination Sought To Be Reviewed 1

 B. Statement of the Issues 2

II. STATEMENT OF FACTS 3

II. SUMMARY OF THE ARGUMENT 5

III. STANDARD OF REVIEW 8

IV. ARGUMENT 9

 A. The Application of Total Adverse Available With Adverse Inference Is Unsupported by Substantial Evidence on the Record and Otherwise Not in Accordance With Law 9

  1. The Legal Standard for Application of AFA 9

  2. Commerce Has Failed To Article How Asia Pacific ("Impacted The Proceeding" Or Any Other Basis For Applying Facts Available under 19 U.S.C. § 1677e(a)(2) 12

  3. Commerce's Finding that Asia Pacific Did Not Cooperate to the Best of Its Ability is Unsupported by Substantial Evidence 14

  4. Commerce Misunderstood the Record Evidence 17

   a. Cost of Production Data 17

   b. Sales Data 23

V. CONCLUSION 25

**TABLE OF AUTHORITIES**

**FEDERAL STATUTES**

19 U.S.C. § 1516a(b)(1)(B)     8

19 U.S.C. § 1677e(a)     10

19 U.S.C. § 1677e(a)(2)     10

19 U.S.C. § 1677e(a)(2)(C)     12

19 U.S.C. § 1677e(b)     10

19 U.S.C. § 1677m(d)     10, 12

**FEDERAL REGULATIONS**

19 C.F.R. § 351.307     16

19 C.F.R. § 351.307(c)     9, 17

**FEDERAL CASES**

*Allegheny Ludlum Corp. v. United States,*
    215 F. Supp. 2d 1322, 1341 (Ct. Int'l Trade 2000)     11

*AMS Associates, Inc. v. United States*,
    719 F.3d 1376, 1379 (Fed Cir. 2013)     12

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556, 1562 (Fed. Cir. 1984)     8

*Bluescope Steel Ltd. v. United States,*
    548 F. Supp. 3d 1351, 1358  (Ct. Int'l Trade 2021)     7, 10, 11

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156, 158 (1962)     8

*Calcutta Seafoods Pvt. Ltd. v. United States,*
    495 F. Supp. 3d. 1318, 1335 (2021)     20

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
    467 U.S. 837, 842 (1984)     9

*Chia Far Indus. Factory Co., Ltd. v. United States,*
    343 F. Supp. 2d 1344, 1366 (CIT 2004)     11

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197, 229 (1951)     8

*Ferro Union, Inc. v. United States,*
    44 F. Supp. 2d 1310, 1329 (Ct. Int'l Trade 1999)     10

*F.11i De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,*
    216 F.3d 1027, 1032 (Fed. Cir. 2000)     11

*Fujitsu General. Ltd. v. United States*,
    88 F.3d 1034, 1038 (Fed. Cir. 1996)     8

ii

**FEDERAL CASES CONT'D**

*Gerber Food (Yunnan) Co. v. United States,*
  387 F. Supp. 2d 1270, 1280 (CIT 2005) (Gerber I) .......... 10

*Guizhou Tyre Co. v. United States,*
  43 CIT ___, ___, Slip Op. 19-59 at 7 (May 15, 2019) .......... 11

*Huong Vuong Corp. v. United States,*
  Slip Op. 21-142, Ct. No. 19-00055 (Oct. 21, 2021) .......... 15

*Koyo Seiko Co. v. United States,*
  20 F.3d 1160 (Fed. Cir. 1994) .......... 9

*Metallverken Nederland B.V. v. United States,*
  728 F. Supp. 730, 734 (CIT 1989) .......... 8

*Nat'l Nail Corp. v. United States,*
  43 CIT ___, ___, Slip Op. 19-71 at 13 (June 12, 2019) .......... 11

*Nippon Steel Corp. v. United States,*
  118 F. Supp. 2d 1366, 1379 (Ct. Int'l Trade 2000) .......... 11

*NTN Bearing Corp. of Am. v. United States,*
  186 F. Supp. 2d 1257, 1274 (Ct. Int'l Trade 2002) .......... 20

*Nucor Corp. v. United States,*
  594 F. Supp. 3d 1320, 1331-32 (CIT 2008) .......... 8

*Olympic Adhesives, Inc. v. United States,*
  899 F.2d 1565 (Fed. Cir. 1990) .......... 6

*PAM, S.p.A. v. United States,*
  582 F.3d 1336, 1339 (Fed. Cir. 2009) .......... 8

*Papierfabrik August Koehler SE v. United States,*
  7 F. Supp. 3d 1304 (Ct. Int'l Trade 2014) .......... 15

*Tung Fung Indus. Co., v. United States,*
  318 F. Supp. 2d 1321, 1335 (Ct. Int'l Trade 2021) .......... 20

*Zenith Radio Corp. v. United States,*
  437 U.S. 443, 450 (1978) .......... 9

*Zhejiang Zhaofeng Mech. & Elec. Co. v. United States,*
  416 F. Supp. 3d 1395, 1400 (Ct. Int'l Trade 2019) .......... 12

**ADMINISTRATIVE DECISIONS**

*Polyester Textured Yarn from Indonesia:*
  86 Fed. Reg. 58875 (October 25, 2021) .......... *et passim*

*Polyester Textured Yarn from Indonesia, Malaysia, Thailand, and the Socialist Republic of Vietnam:*
  86 Fed. Reg. 71031 (December 14, 2021) .......... 2, 5

*Polyester Textured Yarn from Indonesia, Malaysia, Thailand, and the Socialist Republic of Vietnam:*
  85 FR 74680 (November 23, 2020) .......... 3

**ADMINISTRATIVE DECISIONS CONT'D**

*Polyester Textured Yarn from Indonesia:*
  86 FR 29742 (June 3, 2021)                                                    3

## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  Richard K. Eaton, Senior Judge**

| | |
|---|---|
| PT. ASIA PACIFIC FIBERS TBK, | |
| Plaintiff, | Court No. 22-00007 |
| v. | |
| THE UNITED STATES, | Public Version |
| Defendant, | |
| and | |
| UNIFI MANUFACTURING, INC., | |
| and | |
| NAN YA PLASTICS, CORP., | |
| Defendant-Intervenors. | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFF'S
## 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

On behalf of Plaintiff PT. Asia Pacific Fibers TBK ("Asia Pacific" of "APF") a foreign

producer and exporter of polyester textured yarn manufactured in Indonesia, we respectfully

submit the following memorandum in support of the company's 56.2 motion for judgment on the

agency record in this action.  For the reasons stated below, Commerce's decision to replace all of

Asia Pacific's data with facts available and then apply adverse inferences to those facts is based

on a misinterpretation of the antidumping duty statue and is unsupported by substantial evidence.

1

I.      **STATEMENTS PURSUANT TO RULE 56.2(c)(2)**

   A.      **The Administrative Determination Sought To Be Reviewed**

Asia Pacific contests certain aspects of the final determination of the antidumping

investigation of *Polyester Textured Yarn from Indonesia* (A-560-838), issued by the International

Trade Administration of the U.S. Department of Commerce ("Commerce") and published in the

Federal Register on October 25, 2021.  *See Polyester Textured Yarn from Indonesia: Final

Affirmative Determination of Sales at Less the Fair Value,* 86 Fed. Reg. 58875 (October 25,

2021); Public Record Document ("PR") 244; Appendix Tab 1.  The findings and conclusions of

the contested determination were set forth in an accompanying Issues and Decision Memorandum

for the Final Determination, dated October 18, 2021 ("Final I&D Memo"); PR 240; Appendix

Tab  2.

The contested determination covered Plaintiff's exports of polyester textured yarn that

entered into the United States between October 1, 2019 and September 30, 2020.    The contested

determination, and the antidumping duty margin assigned to Asia Pacific, was subsequently

incorporated in an antidumping order.  See *Polyester Textured Yarn from Indonesia, Malaysia,

Thailand, and the Socialist Republic of Vietnam (A-560-838, A-557-823, A-549-843, A-552-832):

Antidumping Duty Orders*, 86 Fed. Reg. 71031 (December 14, 2021); PR 249; Appendix Tab 3.

   B.      **Statement of the Issues**

   1.      Whether Commerce's failure to conduct a verification and issue a verification

report was unsupported by substantial evidence or otherwise not in accordance with law.

   2.      Whether Commerce's application of total AFA based on its determination that

Asia Pacific Fibers failed to reconcile cost allocations and per unit costs to its accounting and/or

135808253.1

Public Version

production systems was unsupported by substantial evidence or otherwise not in accordance with law.

3.      Whether Commerce's determination that Asia Pacific impeded the investigation and failed to cooperate to the best of its ability was unsupported by substantial evidence in the record.

## II.   <u>STATEMENT OF FACTS</u>

Commerce initiated the contested antidumping investigation on November 23, 2020. *Polyester Textured Yarn from Indonesia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations,* 85 Fed. Reg. 74680 (November 23, 2020); PR 32; Appendix Tab 4.  Asia Pacific was selected as a mandatory respondent and participated in the investigation by responding fully to all of Commerce's information requests in a complete and timely manner.  Asia Pacific responded separately to Section A (general, corporate, sales/distribution activities), Sections B (home market sales) and C (United States sales), and Section D (cost of production) of the initial questionnaire and to four supplemental questionnaires in a complete and timely fashion.

Commerce published the preliminary determination in the Federal Register on June 3, 2021.  *Polyester Textured Yarn from Indonesia: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 86 FR 29742 (June 3, 2021); PR 186; Appendix Tab 5.   In the preliminary determination, Commerce used the information provided by Asia Pacific in its questionnaire responses and calculated a preliminary antidumping margin for Asia Pacific equal to 9.21%. Commerce's preliminary determination did not apply total or partial adverse facts available ("AFA") to Asia Pacific but calculated a rate based on the submitted data.

Public Version

On July 9, 2021, Commerce issued a Questionnaire in Lieu of Verification ("QILOV") to Asia Pacific.  PR 211; Appendix Tab 6.  During July and August 2021, the COVID crisis in Indonesia deepened dramatically, as online reports showed that Indonesia had surpassed India as the world's epicenter of the disease.  The worsening crisis forced the Government of Indonesia to decree that all activities in non-essential sectors, which included Asia Pacific, were subject to a 100% work from home policy.[1]  The imposed work at home restrictions made it impossible for Asia Pacific to respond to the QILOV.   Although Asia Pacific's accounting records were generally available to company personnel through the company's computer system, the requested sales documents were not computerized but were maintained in hard copy at the office.

On July 15, 2021, in recognition of the deepening COVID 19 crisis in Indonesia, Commerce withdrew the QILOV. PR 216; Appendix Tab 8   On August 4, 2021, without any indication that the dire circumstances caused by COVID had changed significantly, Commerce issued a revised QILVO and clearly indicated that the one-week turnaround time expected for the response would not be extended. PR 217; Appendix Tab 9. Asia Pacific was still effectively shut down, with extremely limited opportunities for personnel to go into the office to retrieve the requested sales documentation.   Despite the hardship, Asia Pacific did its best to comply with the deadline and submitted its timely response to the Revised QILOV on August 13, 2021. Confidential Record Document ("CR") 266-270; Appendix Tab 10.

On October 25, 2021 Commerce published the final determination in the Federal Register. *Polyester Textured Yarn from Indonesia*, 86 Fed. Reg. at 58875, *supra*.  In the final determination Commerce reversed its findings from the preliminary determination.  "Based on our analysis of Asia Pacific's verification questionnaire response, we have not calculated an estimated final

---

[1] See Letter to Commerce dated July 15, 2022. Asia Pacific Request for Extension of Verification Response; PR 215; Appendix Tab 7.

135808253.1

Public Version

dumping margin for Asia Pacific and, instead, have based Asia Pacific's final rate on total

adverse facts available ("AFA").   Final I&D Memo at 3; supra; Appendix Tab 2.  Asia Pacific's

total AFA margin in the final determination was equal to 26.07%.

Commerce published the antidumping duty order in the *Federal Register* on December

14, 2021.  *Polyester Textured Yarn from Indonesia, Malaysia, Thailand, and the Socialist*

*Republic of Vietnam (A-560-838, A-557-823, A-549-843, A-552-832): Antidumping Duty Orders;*

*supra;* Appendix Tab 3.  On January 13, 2022, Asia Pacific filed a timely summons to initiate this

action.

## III.   <u>SUMMARY OF THE ARGUMENT</u>

For the reasons set forth below, the record evidence does not support Commerce's

application of total adverse facts available. Asia Pacific vehemently disagrees with the ill-

considered determination that Asia Pacific did not respond to Commerce's requests for

information and that the data that Asia Pacific provided throughout the investigation was

unverifiable.  *See* I&D Memo at 12; supra; Appendix Tab 2.  It is undisputed that Asia Pacific

responded in full to each section of the initial questionnaire and four voluminous supplemental

questionnaires (including one on the scope of the investigation), submitting thousands of pages of

documentation concerning its prices and costs.   In addition, the company responded in full to the

QILOV questionnaire, even though it was issued during the darkest days of COVID, when the

company was in full lockdown.  Despite the hardship of a surging COVID pandemic, and lack of

access to its offices, Asia Pacific submitted over five hundred pages of detail and supporting

documentation in response.

A review of the I&D Memo suggests that a fundamental misunderstanding regarding Asia

Pacific's accounting system may have led Commerce to wrongly conclude that Asia Pacific did

not submit supporting documentation that was in its possession. APF explained repeatedly to

135808253.1

Public Version

Commerce that it did not maintain an accounting system that recorded product-specific costs that were integrated into its financial accounting system.[2]   Yet, notwithstanding multiple explanations, Commerce rashly applied adverse facts available on the grounds that Asia Pacific failed to report product-specific costs. Commerce further asserted that Asia Pacific's costs did not reconcile with the trial balance and were not supported by source data or screenshots from Asia Pacific's accounting or production systems.  *Id.*

The specific costs reported by Asia Pacific could not be reconciled to the trial balance because they were not derived from the financial accounting system but were derived from external reports or allocations of the total yarn division costs.   The total yarn division costs reconciled to the trial balances and audited financial statements.  Asia Pacific could not provide supporting documentation from its accounting system or "screen-shots" for the costs of individual yarns because such backup documentation simply does not exist.  Such costs are not found in the financial accounting system.  It is a fundamental principle of antidumping law that AFA is not justified where a respondent cannot produce data because such data does not exist.  See *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565 (Fed. Cir. 1990).  Commerce nevertheless

---

[2] APF stated, for example: "[t]he normal accounting system does not calculate the costs for intermediated products which are internally produced and consumed in making the finished products." *See e.g.* First Supplemental Section D Response at 7; CR 122-125; Appendix Tab. 11. In its response to the Revised Questionnaire In Lieu of Verification, it explained clearly that:

> APF does have not an integrated accounting system such as SAP and we do not have a standard cost accounting system.  APF has calculated the cost per product on the actual consumption of Raw Material, Spares, Power, Chemicals, Manpower etc., and calculated the product cost allocation on basis of general accounting principles

Id. at 12.

135808253.1

Public Version

violated this principle by assigning AFA to Asia Pacific because it could not produce "screen-shots" from its accounting system that do not exist.

In the instant case, the Asia Pacific did not withhold any information and responded to every question issued by Commerce within the time limits provided. If Commerce did not fully understand the contents of Asia Pacific's responses to the verification questionnaire, which appears to be the case, it should have requested clarification, as it would have done in the normal course of an on-site verification. The "back and forth" between the company and Commerce is a critical aspect of the verification process. At an actual verification, a company does not simply hand a pile of complex documents to the verifiers, expecting them to immediately understand the significance of the company's accounting system and sales documents. Instead, company officials typically walk the verifiers through the documents, with ample opportunity for questions from Commerce officials. In fact, Commerce typically affords five full business days to complete the complex and document-specific exercise of verification precisely to afford the parties the opportunity to review the documents *together.* Commerce officials routinely pose many questions during an on-site visit and often assign company officials additional "homework" designed to further clarify their documents. Verification has never been accomplished by simply handing Commerce officials documents for them to review in private, without any communication with the respondent.

Importantly, Commerce never asserted that it was not practicable to afford Asia Pacific the opportunity to remedy or explain how its documentation was fully responsive to the QILOV, as it would in an actual verification. *See Bluescope Steel Ltd. v. United States,* 548 F. Supp. 3d 1351 (Ct. Int'l Trade 2021) (overturning a determination of AFA where Commerce failed to assert that it was not practicable to afford respondent the opportunity to remedy or explain the deficiencies it found). It never provided such opportunity, as it would have in a "on-site"

135808253.1

Public Version

verification.  The lack of an "on-site" verification unfairly denied Asia Pacific Fibers the

opportunity to explain or clarify the documentation submitted in its response in QILOV and to

provide corrective information with Commerce's consent.

In short, Asia Pacific cooperated to the best of its ability in responding to Commerce's

information requests. Commerce's determination should be reversed as the statutory criteria for

application of AFA were not present in this investigation.  Commerce's determination is thus

unsupported by substantial evidence in the record and otherwise not in accordance with law.

## IV.     <u>STANDARD OF REVIEW</u>

When reviewing the final determination of an antidumping duty investigation, the Court

must sustain Commerce's final results unless they are "unsupported by substantial evidence on

the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). *See also*

*Fujitsu General. Ltd. v. United States,* 88 F.3d 1034, 1038 (Fed. Cir. 1996).

Substantial evidence is "more than a mere scintilla," and is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States,*

582 F.3d 1336, 1339 (Fed. Cir. 2009), *quoting Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229

(1951).  In order for a determination to satisfy this standard, "{t}here must be a rational

connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United*

*States,* 371 U.S. 156, 158 (1962); *Nucor Corp. v. United States,* 594 F. Supp. 3d 1320, 1331-32

(CIT 2008). The Court is not to reweigh the evidence or substitute its judgment for that of

Commerce. *See Metallverken Nederland B.V. v. United States,* 728 F. Supp. 730, 734 (CIT 1989).

Judicial review of agency action must be based on the record as a whole, and the Court must take

into account "whatever in the record fairly detracts from its weight." *Atl. Sugar, Ltd. v. United*

*States,* 744 F.2d 1556, 1562 (Fed. Cir. 1984).

In reviewing Commerce's interpretation of the statute, the first question is whether the statutory language is clear and unambiguous as to the precise question at issue. If so, that is the end of the matter as the clear intent of Congress must be applied. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842 (1984).  If, however, the statute is silent or ambiguous with respect to the specific issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.  The agency's construction need not be the only reasonable interpretation or even the most reasonable interpretation.  *See Zenith Radio Corp. v. United States,* 437 U.S. 443, 450 (1978). The court must defer to Commerce's reasonable interpretation of a statute even if it might have adopted another interpretation if the question had first arisen in a judicial proceeding. *Id.*  Thus, the Court will uphold such statutory interpretations by Commerce if they are reasonable. *See Koyo Seiko Co. v. United States,* 20 F.3d 1160 (Fed. Cir. 1994).

Commerce misinterpreted the statute governing the proper application of adverse facts available by failing to reasonably implement its own obligation to conduct a verification and to issue a verification report in accordance with 19 C.F.R. § 307 (c).  While Asia Pacific recognizes that as a practical matter, international travel restrictions prevented an on-site verification in Indonesia, Commerce nevertheless had an obligation to simulate an actual verification as closely as possible by allowing Asia Pacific to respond to questions that the verifiers may have had in while reviewing the substantiating documents (as would occur in an on-site verification).

9

## V.     ARGUMENT

### A.     The Application of Total Facts Available With Adverse Inferences Is Unsupported by Substantial Evidence on the Record and Otherwise Not in Accordance With Law.

#### 1.     The Legal Standard for Application of AFA

Commerce is authorized to invoke "facts otherwise available" when "necessary information is not available on the record," or when a party: (1) withholds requested information; (2) fails to provide information by established deadlines or in the form or manner requested; (3) significantly impedes the review; or (4) provides information that cannot be verified. 19 U.S.C. § 1677e(a)(2); *see also Gerber Food (Yunnan) Co., Ltd. v. United States,* 387 F. Supp. 2d 1270, 1280 (Ct. Int'l Trade 2005). If Commerce finds that a party meets any of these four conditions, then Commerce is authorized to use facts otherwise available, subject to 19 U.S.C. § 1677m(d), to reach the applicable determination. 19 U.S.C. § 1677e(a).

As this Court recognized recently:

> The focus of subsection a is respondent's *failure to provide information*. The reason for the failure is of no moment.  Thus, generally only after Commerce has determined that there is information, missing, creating a gap in the record, can it apply an adverse inference when selecting among the facts otherwise available.

*See BlueScope Steel Ltd. v. United States*, 548 F. Supp. 3d 1351,1358 (2021).  Even if Commerce rightfully finds that respondent failed to provide necessary information, it must comply with 19 U.S.C. § 1677m(d), " which requires [Commerce] to provide a respondent with notice of deficient responses, and an opportunity to remediate, before deciding to rely on facts available.  *Id*.

Application of the adverse facts available statute is a two-step process.   Commerce is not permitted to automatically resort to adverse inferences. *See Nippon Steel Corp. v. United States,* 337 F.3d 1373, 1381 (Fed. Cir. 2003).  Only after Commerce determines that it may resort to facts available under 19 U.S.C. § 1677e(a) for certain information, may it consider whether to

135808253.1

Public Version

draw an adverse inference with respect to that information. Commerce must therefore make a separate and additional finding that a party "failed to cooperate by not acting to the best of its ability to comply with a request for information " before drawing adverse inferences.  19 U.S.C. § 1677e(b); *see also Ferro Union, Inc. v. United States,* 44 F. Supp. 2d 1310, 1329 (Ct. Int'l Trade 1999).  "The focus of subsection (b) is respondent's failure to cooperate to the best of its ability, not its failure to provide requested information." *See BlueScope Steel Ltd. v. United States, supra* at 1358; *see also Guizhou Tyre Co. v. United States*, 43 CIT ___, ___, Slip Op. 19-59 at 7 (May 15, 2019); *Nat'l Nail Corp. v. United States*, 43 CIT ___, ___, Slip Op. 19-71 at 13 (June 12, 2019).

To be supported by substantial evidence, Commerce has an obligation to clearly articulate how it reached the conclusion that a party has failed to act to the best of its ability. *See Allegheny Ludlum Corp. v. United States,* 215 F. Supp. 2d 1322, 1341 (Ct. Int'l Trade 2000).  The focus of the statute is "respondent's failure to cooperate to the best of its ability; not its failure to provide requested information."  *BlueScope Steel Ltd. v. United States*, 548 F.Supp. 3d 1351, 1358 (Ct. Int'l Trade 2021).  This standard implies the respondent's unwillingness to comply or reckless disregard of compliance standards. *Nippon Steel Corp. v. United States,* 118 F. Supp. 2d 1366, 1379 (Ct. Int'l Trade 2000) (Commerce must analyze the allegedly deficient response in light of the respondent's "overall conduct, the importance of the information, the particular time pressures of the investigation, and any other information that bears on the issue of whether the deficiency was an excusable inadvertence or a demonstration of a lack of disregard for its responsibilities in the investigation.").

Even where Commerce properly finds the respondent failed to act to the best of its ability and that therefore an adverse inference can be drawn, Commerce has a continuing obligation to balance the statutory objective of finding an accurate dumping margin with the goal of inducing compliance. *See F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United*

11

135808253.1

Public Version

*States,* 216 F.3d 1027, 1032 (Fed. Cir. 2000); *Chia Far Indus. Factory Co., Ltd. v. United States,* 343 F. Supp. 2d 1344, 1366 (Ct. Int'l Trade, 2004). Commerce's discretion is not unbounded and it must consider whether the assigned AFA rate creates an overly punitive result.   As stated in *BlueScope Steel*, supra., "[a]t all times, the overriding purpose of the statute is to determine an accurate antidumping margin for respondent when one is warranted."   *Id.*  at 1358.  Commerce was able to calculate an antidumping duty for purposes of the preliminary determination; it likewise should have calculated a rate based on the same data for the final determination. *Id.*

> **2.**   **Commerce Has Failed To Articulate How Asia Pacific "Impeded The Proceeding" Or Any Other Basis For Applying Facts Available under 19 U.S.C. § 1677e(a)(2)**

Commerce failed to justify its use of facts available in two respects.   First, Commerce held that that Asia Pacific "has significantly impeded this proceeding pursuant to {19 U.S.C. § 1677e(a)(2)(C)}, and has provided information which could not be verified." Final I&D Memo, supra at 21; P.R. 289; Appendix Tab 2.   Commerce's conclusion, however, is not supported by substantial evidence in the record.  Asia Pacific managed to produce reams of documentation during verification despite a country-wide lockdown in Indonesia, and despite lack of access to Asia Pacific's physical offices.  Commerce does not identify a single instance in which Asia Pacific refused to furnish a document, failed to abide by a deadline, failed to provide a narrative response to a question or forced a shut-down verification.  It is therefore difficult to understand how Asia Pacific's conduct could have impeded the investigation.  *Cf.  Zhejiang Zhaofeng Mech. & Elec. Co. v. United States*, 416 F. Supp 3d 1395, 1400 (Ct. Int'l Trade 2019) (respondent impeded the proceeding by withholding sales information and misleading Commerce at verification); *AMS Associates, Inc. v. United States,* 719 F.3d 1376, 1379 (Fed Cir. 2013) (respondent's withdrawal from the proceeding impeded Commerce's ability to verify any

12

135808253.1

Public Version

information); *National Candle Ass'n v. United States*, 366 F. Supp. 2d 1318, 1322 (Ct. Int'l Trade 2005) (respondent's refusal to allow verification seriously impeded Commerce's proceeding).

Second, Commerce did not comply with 19 U.S.C. § 1677m(d), which requires it to provide a respondent with notice of deficient responses (the QILOV constitutes a questionnaire like any other), and an opportunity to remediate the record, before deciding to rely on facts available. The lack of notice and follow-up was directly attributable to the secretive mode of verification conducted by Commerce, which would never have transpired had an on-site verification taken place.  There is daily interaction with the verifiers at an on-site verification, with ample opportunity to respond to questions from the verifiers, and submit clarifying documentation. The lack of an "on-site" verification unfairly denied Asia Pacific the opportunity to explain or clarify the documentation submitted in its response to the QILOV and to provide corrective information with Commerce's consent.  In the absence of an actual on-site verification, Commerce had an obligation to simulate the procedures, which provide for substantial interaction between verifiers and company officials.

Commerce appears to not have fully understood the documentation submitted by Asia Pacific, but never reached out to request guidance or clarification as it would have done in a normal verification and as it should have in an attempt to simulate an actual verification.  There is no evidence in the record of lack of cooperation.  Commerce has not identified questions to which Asia Pacific refused to respond. The only remiss to which Commerce can cite is Asia Pacific's failure to provide accounting documents that did not exist, as discussed below.

In short, Commerce has failed to support with record evidence its conclusion that Asia Pacific "impeded the investigation."  If anything, Commerce's refusal to ask questions about verification documents, as it would do in the normal course in an on-site verification, "impeded" a successful verification, which would have occurred if Commerce had complied with its usual

135808253.1

Public Version

procedures for an on-site verification (even in a remote or virtual context).    Commerce's

determination should be reversed as the statutory criteria for application of AFA were not

present in this investigation, and therefore the determination is unsupported by substantial

evidence in the record and otherwise not in accordance with law.

### 3.  Commerce's Finding that Asia Pacific Did Not Cooperate to the Best of Its Ability is Unsupported by Substantial Evidence

Asia Pacific's overall conduct and cooperation in this investigation has been impeccable,

particularly under the circumstances of this case, in which a proxy "verification" took place

through the issuance of a questionnaire.  Asia Pacific's responses were accurate and complete

(and relied upon in the preliminary determination).  The COVID pandemic and consequent

shutdown prevented many company officials from working at the office.  There was no

opportunity at all to communicate with Commerce officials face-to-face.   Asia Pacific Fibers

cooperated to the best of its ability in responding to Commerce's information requests and its

QILOV despite a COVID shutdown and the inability of all personnel to go the office to seek

source documents.

Asia Pacific fully and accurately complied with all of Commerce's requests for

information, and to the extent there were any deficiencies, it remedied them with timely

responses to the supplemental questionnaires issued by Commerce.    It further responded with

copious, supportive company data in response to the QILOV and met all deadlines established

by Commerce despite the rampant spread of the COVID pandemic, which resulted in a shutdown

of all non-essential businesses in Indonesia, including Asia Pacific's offices.   Notwithstanding

the lack of access to its physical offices, Asia Pacific produced all the documentation that existed

(it could not comply with requests for accounting documents that did not exist as they were not

maintained in the normal course of business, as explained below).

135808253.1

Public Version

In short, Asia Pacific cooperated fully, responding to all requests for information and participating fully in verification. All of the data submitted during the proceeding proved to be accurate through the company's response to the QILOV. There is no evidence on the record, nor does Commerce allege, that Asia Pacific concealed data responsive to Commerce's information requests. *Cf. Papierfabrik August Koehler SE v. United States,* 7 F. Supp. 3d 1304 (Ct. Int'l Trade 2014) (importer concealed German destination of sales and did not provide full reporting of home market sales). In contrast to other cases in which total adverse inferences have been invoked, Asia Pacific acted with full cooperation at all times, even though it faced the hardship brought about by the COVID pandemic. *See, e.g. Huong Vuong Corp.* v. *United States*, Slip Op. 21-142, Ct. No. 19-00055 (Oct. 21, 2021) (finding of total adverse facts available because respondent failed to correct deficiencies in questionnaire responses despite having the opportunity to do so).

Commerce claims that Asia Pacific failed to "provide record evidence from its accounting systems to support critical information necessary to ensure that the starting point for its reported per-unity costs was based on data from its normal books and records its reported per-unit costs were based on data from its accounting system." I& D Memo, *supra* at 12; Appendix Tab 2. It appears that Commerce's conclusion that Asia Pacific omitted supporting documentation is based on either a misinterpretation or a misunderstanding of Asia Pacific's detailed questionnaire response to the QILOV. Had there been a verification, even a virtual verification, or even if Commerce had simply taken the initiative to ask, Asia Pacific could have clarified any aspect of the administrative record and shown Commerce how the documents tied, even though it was unable to provide certain screenshots because they did not exist. The verification in this case lacked all critical elements of an on-site verification. Had an actual on-site verification been conducted (or anything even close), Commerce's misinterpretation of the

15

data submitted in response to the verification questionnaire would never have occurred. The issues would have been resolved by communication between the company and the verifiers.

Moreover, had there been an on-site verification, the company would have been furnished with a verification outline prior to the commencement of the verification, which would have identified the particular sales and costs upon which the agency would focus. Typically, a company spends considerable time preparing for the verification by collecting and reviewing the documentation identified in the verification outlines. Mistakes in reported data are inevitable given the large volume of information requested by Commerce in its various questionnaires. Companies are directed and encouraged to bring "minor errors" to the verifiers' attention at the outset of verification. Asia Pacific had no such similar opportunity to apprise the verifiers of minor errors or to correct such errors. Instead, Commerce has listed any such minor errors in support of its AFA finding.

Arguably, Asia Pacific was entitled to an on-site verification pursuant to 19 C.F.R. §351.307. The COVID pandemic, and restrictions on travel between Indonesia and the United States, however, foreclosed the possibility of an on-site verification in Indonesia, at least within the statutory timeframe for completion of the antidumping investigation. Yet, even within the constraints of COVID, Commerce could have easily reached out to Asia Pacific with questions about the documents submitted in response to the QILOV. Such questions would have been undoubtedly asked and answered in an on-site verification. Asia Pacific should not bear the burden of AFA determination because the procedures established by Commerce were not designed to simulate an actual verification as closely as possible, and were therefore insufficient for an antidumping investigation. The "verification" that ultimately took place occurred in a "black box." Asia Pacific had no inkling that its documentation was considered insufficient by Commerce, and certainly had no opportunity to rectify any gap that Commerce may have

16

perceived.  Commerce had calculated an actual margin in the preliminary determination, and Asia Pacific had every reason to believe that it would continue to do so in the final determination.

Asia Pacific was further kept in the dark because the agency did not produce a verification report prior to the final determination, as it is required to do by its own regulations. Pursuant to 351.307(c), Commerce is required to issue a verification report prior to making a final determination in an investigation.  The verification report must provide details with respect to the methods, procedures, and results of a verification in an investigation. Commerce did not produce any such document in this case.  Had Commerce issued a verification report, Asia Pacific would have had an opportunity to comment on the agency's findings and this appeal may have not been necessary.  Commerce never issued any verification report, however, and did not provide Asia Pacific with any opportunity to rectify what Commerce perceived as deficiencies in the response to the QILOV.

    **4.**    <u>**Commerce Misunderstood the Record Evidence**</u>.

        **a**.    <u>**Cost of Production Data**</u>

A review of Commerce's final determination demonstrates that Commerce's justification for the AFA is simply not supported by substantial evidence.  In support of AFA, the Department claimed that: (1) Asia Pacific did not directly link per-unit costs to its trial balance or accounting records; and that (2) that the company did not show how the specific amount in its "cost allocation summary worksheet" were determined and further "trace the amounts to the source data from the accounting system."  I&D Memo, *supra* at 12; Appendix Tab 2. Commerce acknowledged that Asia Pacific's cost allocation summary worksheet (attached hereto as Exhibit 1 for the convenience of the Court) is a critical document that goes to the heart of the company's cost allocation.  Yet, Commerce claims wrongly that despite multiple requests,

17

Asia Pacific "did not provide supporting information for its reported raw material chip costs and machine speeds used to allocatee the reported conversation costs for each denier range."  I&D Memo, *supra* at 12; Appendix Tab 2.  Commerce's claim is easily disproved.

First, Asia Pacific emphasized throughout the response that it had no cost accounting system integrated with its financial accounting system from which it could report per-unit costs that would tie directly to the trial balance and accounting records.  Asia Pacific's responses included the following clear assertions:

1.  Asia Pacific does not have a formal `cost' accounting system. Asia Pacific relies on actual costs as recorded in the financial accounting system to derive the costs associated with production". [3]

2.  The normal accounting system does not calculate the costs for intermediate products which are internally produced and consumed in making the finished products."[4]

3.   Asia Pacific does not maintain a process cost accounting system and does not maintain production in cost at each processing stage. [5]

4.  All production costs have been allocated to the four product cost centers – POY, DTY, SDY and ITY.  [6]

5.  Asia Pacific does have not an integrated accounting system such as SAP and we do not have a standard cost accounting system.  APF has calculated the cost per product on the actual consumption of raw material, spares, power, chemicals, manpower etc., and calculated the product cost allocation on basis of general accounting principles.[7]

Because it did not maintain a cost accounting system, Asia Pacific explained to Commerce that it could not match the reported per-unit costs directly to its trial balance.   It

---

[3] Asia Pacific Section D Response at page 8; CR 34-36; Appendix Tab 12.
[4] Asia Pacific 1st Supplemental Section D Response, *supra* at page 7; Appendix Tab 11.
[5] Asia Pacific 2nd Supplemental Section D Response at page 2; CR 196; Appendix Tab 13.
[6] Asia Pacific 2nd Supplemental Section D Response; id. at Page 13:
[7] Re-issued Verification Questionnaire, *supra* at 12; Appendix Tab 9.

135808253.1

Public Version

explained clearly that it had submitted a revised cost *allocation* summary worksheet (Asia Pacific 1st Supplemental Response at Exhibit SD-1), attached as Exhibit 1 for easy reference) [8] for the total costs to produce intermediate and finished products that linked in the aggregate directly to the company's trial balance and accounting records.  The ultimate per-unit costs were derived from the allocation costs contained in the cost allocation summary worksheet. Asia Pacific demonstrated that each number in the cost allocation summary worksheet reconciled to its trial balance in the aggregate.  *Id.*   The company could not match the per-unit costs directed to the trial balance, however.

All figures obtained from the financial accounting system are on an aggregate basis – product code specific costs are not maintained.  Asia Pacific has <u>allocated</u> the costs and expenses to specific types of products and corresponding CONNUMs based on the manufacturing quantities records maintained by Asia Pacific in the ordinary production process. Specifically, Asia Pacific submitted evidence that it could identify through external reports the actual costs consumed for each primary yarn product and allocate other costs to different yarn products. The total yarn division costs reconciled to the trial balances and audited financial statements. Yet the Department seemingly ignored these facts and continually asked for "source" accounting records and screen shots from the accounting system – records that do not exist.

For example, the Commerce states that:

> Asia Pacific failed to provide supporting information for the POY and
> SDY transferred quantities, as none of the exhibits submitted . . . provide
> the requested documentation (*i.e.* documentation from our financial
> system, screen prints for the relevant inquiries in the accounting system,
> tracing of the reported amounts to the company's trial balance and

---

[8]  Asia Pacific Section D Response, *supra* at Exhibit D-13; Appendix Tab 12.  See also Asia Pacific 1st Supplemental  Response, *supra* at Exhibit SD-1- Rev. D.13; Appendix Tab 11.

135808253.1

Public Version

production records, and screen shots from your financial, accounting
and/or production systems."

I&D Memo, supra at 13; Appendix Tab 2.

The cost allocation summary worksheet is the heart of Asia Pacific's report costs.  The figures contained in this document ties in the aggregate to Asia Pacific's trial balance and accounting records. The figures contained therein do not individually match the numbers found the financial, accounting and/or production systems because they represent *allocations*, not actual costs.  For the same reason, Asia Pacific could not provide the requested screen shots—a mere screen shot would  not produce the allocated numbers from the Exhibit.  This Court has held that it is unlawful for Commerce to apply facts available for failure to provide data that does not exist. *See Calcutta Seafoods Pvt. Ltd. v. United States*, 495 F. Supp. 3d. 1318, 1335 (2021) ('The [respondent] was not required to provide information that it did not have, and Commerce cannot penalize the [respondent] for [not] providing information it did not possess."). *See also Tung Fung Indus. Co*., 318 F. Supp. 2d 1321, 1335 (Ct. Int'l Trade 2021) (Commerce is not permitted to require a party to manufacture or rely on a calculation scheme that would result in inaccurate data); *See* also *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565 (Fed. Cir. 1990); *NTN Bearing Corp. of Am. v. United States*, 186 F. Supp. 2d 1257, 1274 (Ct. Int'l Trade 2002)

The Department also claims that Asia failed to provide an inventory movement schedule for pure terephthalic acid ("PTA") and mono ethylene glycol ("MEG") and Asia Pacific failed to demonstrate how the quantity and value used to calculate the per-unit raw material chip costs trace back to the source data in the accounting system.  I&D at 11. This statement is perplexing given that APF provided a detailed inventory movement schedule for PTA and MEG in its original Section D Response as Exhibit D-2, which is attached as Exhibit 2 for ease of reference.

20

As Asia Pacific stated in its responses, it does not produce PTA and MEG, it purchases these raw materials, which are used to product chips.  Therefore, there are no production quantity records for PTA and MEG.  The total POI purchased value of these two inputs equal

[                                          ].  The total consumption value of PTA and MEG as provided equals [                                    ].  Asia Pacific Section D Response at Exhibit D2, *supra*; Appendix Tab 12.  Both the purchase value and consumption value of PTA and MEG tie directly to Asia Pacific's accounting system in its submitted company-wide trial balance as demonstrated below:

| [                               ]   [         ] | | |
|---|---|---|
| PEMBELIAN (Purchase) - RAW MATERIAL APF-2 IMPORT}   [         ] | | |
| Total PTA & MEG POI Purchases: | [         ] | (A) |
| BEGINNING BALANCE - RM APF-2 | [       ] | (B) |
| ENDING BALANCE - RAW MATERIAL APF-2 | [       ] | (C) |
| **TOTAL POI CONSUMPTION**: | [         ] | (A+B+C) |

See Asia Pacific Section D Response at Exhibit D-2, supra and Exhibit D-13; Appendix Tab 12.

This same [           ] is reported as the PTA and MEG raw material costs in the chip cost calculation file.  Id.   This cost equates to [    ]% of the total net cost of producing the standard SD chip. Yet, the Department claims that that the only link between the CONNUM-specific raw material cost worksheets and Asia Pacific's books and records are the beginning and ending inventory values for polyester chips that tie to the trial balance, despite the fact that the total chip production costs, including PTA and MEG costs tie directly to the POI trial balance.  *Id*.

21

Public Version

Asia Pacific does not maintain cost accounting records of the value of chips assigned to each of the four products produced by the yarn division. As explained in the responses, the per unit chip costs are multiplied by the quantity of chips consumed to produce each product to derive the chip costs per product. There is no cost accounting or financial accounting report that reports these values.

The Department states that the failure to account for cost differences associated with four of the product characteristics defined by Commerce is also a basis for the application of AFA. I & D Memo at page 7, supra; Appendix Tab 2.  The Department again seeks to penalize Asia Pacific for failing to provide data that simply does not exists.   Asia Pacific does not experience cost of production difference between products with varying number plies, filaments, intermingling or cross section shape. The Department often identifies product characteristics that are not associated with cost of production differences. Asia Pacific's production process, including types of machines and output rate result in no cost or production differences based on the certain product characteristics.   Asia Pacific stated clearly that in its Second Supplemental D Response:

> The number plies, filaments, intermingling or cross section shape have no impact on the cost of production because there are no differences in raw materials or processing steps and the efficiency of the processes are the same within the same denier ranges.
>
> Filaments: The number of filaments does not affect APF's production based on APF's experience and computation of data in many past years.
>
> Ply: The plying ( doubling) of the yarn does not change the texturising machine efficiency or productivity.  The yarn is double plied by combining the output of 2 spindles ( positions) of the texturising machine. There is no loss or gain in machine spindle productivity for the same denier filament if it is single or plied yarn.
>
> Intermingling: Intermingling is a process of imparting air pressure on the yarn after texturising. The air jets are already installed on the machine, and turned on when the intermingling yarn is required. APF does not and

22

cannot track the expenses associated with the application of compressed
air and believes that this expense, if it were traceable, is immaterial.

Cross Section: The cross section in the yarn is the outcome of the type of
spinnerets ( FILTER)  used in the spinning process.   The polymer passes
through this filter.   The design of the holes  in the filter defines the cross
section of the yarn. Thus, there is no change in the costs during this
production of different cross sections. [9]

Finally, Commerce berates Asia Pacific for failing to report data machines speeds used

to allocate costs per machine hour per product.  I&D Memo, supra at 11; Appendix Tab 2.  Once

again, Asia Pacific explained to Commerce that it does maintain any such data in the normal

course of business. Given that Asia Pacific does not differentiate insignificant cost differences in

the form and manner requested by Commerce, it is unlawful for Commerce to apply AFA.

      **b.**    <u>**Sales Data**</u>

Commerce has also identified numerous instances in which sales documentation could

not, allegedly be verified.  In response, Asia Pacific is providing below a chart that demonstrates

that many of these alleged discrepancies were insignificant in nature.  These alleged

discrepancies should NOT form the basis for an AFA determination.

| Point | DOC COMMENT | RESPONSE |
|-------|-------------|----------|
| 1 | In its verification questionnaire response, Asia Pacific reported warehouse charges of [ ], however, the figure reported in the warehousing expense field in the sales database is [ ]. | Please see the attached Exhibits: S2-20b and a page from S3-1.a from the QILOV. These Exhibits include the exact same figures. In Exhibit S3-1a, Asia Pacific merely added the transportation charges in one row above where they are reported in in Exhibit S2-20b. The figures in the two exhibits are identical and yet the Department claims that Asia Pacific failed to Asia Pacific failed to provide an explanation to substantiate how its warehousing expenses are reported. Asia Pacific also included an explanation in Exhibit S3-1.a regarding the warehouse cost  calculation: |
| 2 | Asia Pacific has failed to reconcile the shipment dates for all export sales with any | The Department is well aware that the dates reported under the date of shipment field ("SHIPDATU") |

---

[9] Asia Pacific's 2nd Supplemental D Response at 10-11, supra; Appendix Tab 13.

135808253.1

Public Version

| | | |
|---|---|---|
| | supporting documentation provided in its verification questionnaire response. The Department states that the reported shipment dates were days than the dates indicated on a range of documents, such as the bill of ladings and insurance certificates that reference "shipped on board dates." | represent the date that the product left the factory.  We have reported the date of shipment from Asia Pacific's factory in this field. The  Department knew very well that the bill of lading dates are not the date of shipment from the factory because Asia Pacific reported the bill of lading dates in field BLDATEU in the US sales file. The Department cites the same dates reported under BLDATEU as discrepancies to the reported dates of shipment, the adjacent field in the sales file. |
| 3 | The supporting documentation reported by Asia Pacific in the verification questionnaire response shows that the indirect selling expense ratios to be [                                              ], which does not reconcile to the reported indirect selling expenses.  when applied to the gross unit price in the sales database. | The supporting documentation reported by Asia Pacific in Exhibit S3-1.a the verification questionnaire response shows that the indirect selling expense ratios to be [                                     ], not the figures cited by the Department.  This is clearly demonstrated by the figures reported under each separately identified column in Exhibit S3-1a. The figures on S3-1.a are identical to the indirect selling expenses reported in Exhibit S2-41 of the 2nd supplemental  questionnaire response except for the bifurcation of Marketing Expenses, which were allocated to HM and export indirect selling expenses in Exhibit S2-41 but inadvertently reported exclusively as HM indirect selling expense. This slight difference, which was obvious from the comparison of the two exhibits, resulted in a difference of the export indirect selling expense ratio three hundredths of a percentage point from 0.96% and 0.93% . Not only will this have no impact on the AD margin up to one hundredth  of a percentage point, but the Department can easily apply an indirect selling expense ratio to sales by one simple line of SAS code, which it often does. |
| 4 | The quantity reported of sale SEQH [        ] in the sales database does not reconcile with the supporting documentation provided in the verification questionnaire response. | The reported HM sales quantity reported for SEQH 7707 is [     ] kilo, not [         ] kilos referenced by the Department. The [      ] kilos is supported by the documentation provided in  Exhibit S3-1.a. The Department must be referring to the sales value of this sales observation. However, the sale invoice ("Nota Penjualan") included in Exhibit S3-1.a of the QILOV clearly shows the sales quantity of [        ] at a unit price of [        ] for a total of [             ]. These figures reconcile to the HM sales file and the total sales value plus applicable taxes reconcile to Asia Pacific's payment records for this customer, as included in S3-1a. |
| 5 | The Department claims that the reported sales quantity for SEQU [       ] does not reconcile | The reported sales quantity for SEQU [       ] does reconcile to the supporting documentation provided in QILOV response. Asia Pacific provided supporting sales documentation for the |

24

| | |
|---|---|
| with the supporting documentation provided in the verification questionnaire response. | sales invoice that includes SEQU[     ] in the US sales file. Documentation is on an invoice-specific basis, not an invoice line-item basis. The quantity reported in the US sales file SEQU [     ] for product [              ] is [       ] kilos. SEQU [     ] in the US sales file includes a quantity of [     ] for the same product on the same sales invoice. The sum of the quantities for this product in SEQU [     ] and SEQU [     ] on the sale invoice [     ] reconciles exactly to the commercial sales invoice provided in S3-1.a - [        ] kilos sold at [$     ] per kilo.  Even a cursory review of the sales file and supporting data reveals that this product was invoiced as two line-items on the sales invoice, The Department even references Asia Pacific's sales register in attached Exhibit S3-1.bb of the QILOV where the [                                    ] for the same product on the same sales invoice is listed in sequence. |

## IV.   CONCLUSION

For the foregoing reasons, Asia Pacific respectfully requests that this Court hold that Commerce's final determination in the investigation of *Polyester Textured Yarn from Indonesia* was not supported by substantial evidence or otherwise in accordance with law.  This case should be remanded to Commerce with instructions to revise its final determination consistent with this Court's opinion.

Respectfully submitted,

*/s/Lizbeth R. Levinson*

Lizbeth R. Levinson
Ronald M. Wisla
Brittney R. Powell
Fox Rothschild LLP
2020 K Street, N.W.
Suite 500
Dated: July 15, 2022         Washington, D.C. 20006
Attorneys for Asia Pacific

25

## **Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2016 using a proportionally spaced typeface (12-point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 8,016 words.  This certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ *Ronald M. Wisla*

Lizbeth R. Levinson
Ronald M. Wisla
Brittney R. Powell

FOX ROTHSCHILD LLP
2020 K Street, NW
Suite 500
Washington, DC  20006
 Tel:   202-794-1183
 Fax:   202-461-3102

July 15, 2022