**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE RICHARD K. EATON, SENIOR JUDGE**

| | |
|---|---|
| PT. ASIA PACIFIC FIBERS TBK, | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| UNFI MANUFACTURING, INC., | ) |
| and | ) |
| NA YA PLASTICS, CORP., | ) |
| Defendant-Intervenors. | ) |

Court No. 22-0007
**PUBLIC VERSION**

Business Proprietary Information
Removed From
pp. 32, 40, 43-44

**DEFENDANT'S RESPONSE TO PLAINTIFF'S RULE 56.2 MOTION FOR
JUDGMENT ON THE AGENCY RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

Eric J. Singley
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone:  (202) 616-1273
Facsimile:   (202) 307-0972
Email: Eric.j.singley@usdoj.gov

September 23, 2022

*Attorneys for Defendant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

STATEMENT PURSUANT TO RULE 56.2 ........................................................... 2

I.      Administrative Determination Under Review ................................................ 2

II.     Issues Presented For Review .......................................................................... 2

STATEMENT OF FACTS ....................................................................................... 2

SUMMARY OF THE ARGUMENT ...................................................................... 10

ARGUMENT .......................................................................................................... 11

I.      Legal Standards ............................................................................................. 11

        A.      Standard Of Review ............................................................................ 11

II.     APF's Challenge To Commerce's Verification Methods Should Be Dismissed
        Because APF Failed To Exhaust Administrative Remedies ........................... 13

        A.      Legal Framework For Exhaustion Of Administrative Remedies ........... 13

        B.      APF Did Not Challenge Commerce's Verification Before The Agency ... 14

        C.      Commerce's Verification Was Consistent With The Statute And Necessary
                As A Result Of The COVID-19 Pandemic .......................................... 22

III.    Commerce's Final Determination Is Supported By Substantial Evidence And In
        Accordance With Law ................................................................................... 24

        A.      Legal Framework For The Application Of Facts Otherwise Available
                With Adverse Inferences ..................................................................... 24

        B.      Substantial Evidence Supports Commerce's Use Of Facts Otherwise
                Available .............................................................................................. 25

        C.      Substantial Evidence Supports Commerce's Application Of An Adverse
                Inference Based On APF's Failure To Cooperate ................................ 33

        D.      APF's Arguments That Commerce Misunderstood Record Evidence
                Are Belied By The Record And Fail To Show That Commerce's Final
                Determination Is Unsupported By Substantial Evidence ....................... 37

CONCLUSION ....................................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*ABB, Inc. v. United States*,
    920 F.3d 811 (Fed. Cir. 2019) ................................................................. 13

*Am. Silicon Techs. v. United States*,
    261 F.3d 1371 (Fed. Cir. 2001) ............................................................... 12

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) ............................................................... 12

*Boomerang Tube, LLC TMK IP-SCO v. United States*,
    856 F.3d 908 (Fed. Cir. 2017) ................................................................. 13

*Clearon Corp. v. United States*,
    800 F. Supp. 2d 1355 (Ct. Int'l Trade 2011) .......................................... 14

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938) ................................................................................ 11

*Consolidated Bearings v. United States*,
    348 F.3d 997 (Fed. Cir. 2003) ................................................................. 21

*Corus Staal BV v. United States*,
    502 F.3d 1370 (Fed. Cir. 2007) ................................................... 13, 14, 21

*Crawfish Processors All. v. United States*,
    483 F.3d 1358 (Fed. Cir. 2007) ............................................................... 11

*Dongguan Sunrise Furniture Co. v. United States*,
    865 F. Supp. 2d 1216 (Ct. Int'l Trade 2012) ..................................... 36, 37

*Dorbest Ltd. v. United States*,
    604 F.3d 1363 (Fed. Cir. 2010) ............................................................... 13

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996) ........................................................... 11, 12

*Goldlink Indus. Co. v. United States*,
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) .......................................... 12

*Goodluck India Ltd. v. United States*,
    11 F.4th 1335 (Fed. Cir. 2021) .......................................................... 20, 23

*Hung Vuong Corp. v. United States*,
    483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) ..................................... 20, 36

*Hyundai Steel Co. v. United States,*
    282 F. Supp. 3d 1332 (Ct. Int'l Trade 2018)........................................................ 36

*Hyundai Steel Co. v. United States,*
    319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018)........................................................ 34

*INS v. Elias-Zacarias,*
    502 U.S. 478 (1992)............................................................................................ 12

*McCarthy v. Madigan,*
    503 U.S. 140 (1992)............................................................................................ 14

*Mittal Steel Point Lisas Ltd. v. United States,*
    548 F.3d 1375 (Fed. Cir. 2008)........................................................................... 13

*Nan Ya Plastics Corp. v. United States,*
    810 F.3d 1333 (Fed. Cir. 2016)........................................................................... 40

*Nippon Steel Corp. v. United States,*
    337 F.3d 1373 (Fed. Cir. 2003)..................................................................... 25, 35

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006)........................................................................... 12

*NTN Bearing Corp. v. United States,*
    74 F.3d 1204 (Fed. Cir. 1995)............................................................................. 34

*Nucor Corp. v. United States,*
    286 F. Supp. 3d 1364 (Ct. Int'l Trade 2018) ...................................................... 19

*Ozdemir Boru San Ve Tic. Ltd. v. United States,*
    273 F. Supp. 3d 1225 (Fed. Cir. 2017)................................................................ 25

*PAM S.p.A. v. United States,*
    463 F.3d 1345 (Fed. Cir. 2006)........................................................................... 17

*PAM, S.p.A. v. United States,*
    582 F.3d 1336 (Fed. Cir. 2009)........................................................................... 11

*Prime Time Com. LLC v. United States,*
    495 F. Supp. 3d 1308 (Ct. Int'l Trade 2021)...................................................... 13

*Qingdao Sea-Line Trading Co. v. United States,*
    766 F.3d 1378 (Fed. Cir. 2014)........................................................................... 12

*QVD Food Co. v. United States,*
    658 F.3d 1318 (Fed. Cir. 2011)........................................................................... 12

*Rhone Poulenc v. United States,*
  899 F.2d 1185 (Fed. Cir. 1990) ................................................................. 39

*Samsung Elecs. Co. Ltd., v. United States,*
  72 F. Supp. 3d 1359 (Ct. Int'l Trade 2015) .............................................. 21

*Taian Ziyang Food Co., Ltd. v. United States,*
  918 F. Supp. 2d 1345 (Ct. Int'l Trade 2013) ............................................ 20

*Tianjin Mach. Imp. & Exp. Corp. v. United States,*
  353 F. Supp. 2d 1294 (2004), *aff'd,* 146 F. App'x 493 (Fed. Cir. 2005) ................................. 36

*Torrington Co. v. United States,*
  68 F.3d 1347 (Fed. Cir. 1995) ................................................................... 23

*United States v. Eurodif S.A.,*
  555 U.S. 305 (2009) ................................................................................. 11

*Universal Camera Corp. v. NLRB,*
  340 U.S. 474 (1951) ................................................................................. 11

## Statutes

19 U.S.C. § 1516a ........................................................................................ 11

19 U.S.C. § 1677e ................................................................................... passim

19 U.S.C. § 1677m .................................................................................. passim

28 U.S.C. § 2637(d) .............................................................................. 13, 22

## Regulations

19 C.F.R. § 351.307 ................................................................................ 17, 23

19 C.F.R. § 351.308 ..................................................................................... 25

19 C.F.R. § 351.309 ................................................................................ passim

19 C.F.R. § 351.224 ..................................................................................... 44

## Other Authorities

*Polyester Textured Yarn From Indonesia, Malaysia, Thailand, and the Socialist Republic of
  Vietnam: Initiation of Less-Than-Fair-Value Investigations,*
  85 Fed. Reg. 74,680 (Dep't of Commerce Nov. 23, 2020) ......................................... 3

*Polyester Textured Yarn From Indonesia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Postponement of Preliminary Determinations in the Less-Than-Fair-Value Investigations*,
   86 Fed. Reg. 17,362 (Dep't of Commerce April 2, 2021) ........................................................ 6

*Polyester Textured Yarn from Indonesia:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*,
   86 Fed. Reg. 29,742 (Dep't of Commerce June 3, 2021) ................................................. 6, 7, 14

*Polyester Textured Yarn from Indonesia: Final Affirmative Determination of Sales at Less Than Fair Value,*
   86 Fed. Reg. 58,875 (Dep't of Commerce Oct. 25, 2021)..................................................... 2, 9

*Polyester Textured Yarn from Indonesia, Malaysia, Thailand, and the Socialist Republic of Vietnam, Antidumping Duty Orders*;
   86 Fed. Reg. 71,031 (Dep't of Commerce Dec. 14, 2021) ......................................................... 2

Uruguay Round Trade Agreement, Statement of Administrative Action,
   H.R. Doc. No. 103-316 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040 ................. 17, 23, 25

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE RICHARD K. EATON, SENIOR JUDGE**

| | | |
|---|---|---|
| PT. ASIA PACIFIC FIBERS TBK, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| UNITED STATES, | ) | |
| Defendant, | ) | Court No. 22-0007 |
| | ) | **PUBLIC VERSION** |
| and | ) | Business Proprietary Information |
| | ) | Removed From |
| UNFI MANUFACTURING, INC., | ) | pp. 32, 40, 43-44 |
| and | ) | |
| NA YA PLASTICS, CORP., | ) | |
| Defendant-Intervenors. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, defendant, the United States, respectfully submits this response in opposition to the motion for judgment upon the agency record submitted by plaintiff, PT. Asia Pacific Fibers TBK (plaintiff or APF). APF challenges the Department of Commerce's (Commerce) final determination in the antidumping duty investigation of polyester textured yarn from Indonesia. As demonstrated below, Commerce's final determination is supported by substantial evidence and otherwise in accordance with law. Accordingly, the Court should sustain Commerce's final determination, deny APF's motion, and enter judgment for the United States.

**STATEMENT PURSUANT TO RULE 56.2**

**I.       Administrative Determination Under Review**

APF challenges certain aspects of Commerce's final affirmative determination in the antidumping duty investigation of polyester textured yarn from Indonesia. S*ee Polyester Textured Yarn from Indonesia: Final Affirmative Determination of Sales at Less Than Fair Value,* 86 Fed. Reg. 58,875 (Dep't of Commerce Oct. 25, 2021) (final determination), and accompanying Issues and Decision Memorandum (IDM) (P.R. 244).[1]  Following an affirmative injury determination by the U.S. International Trade Commission, Commerce published an antidumping duty order in the *Federal Register* on December 14, 2021.  *See Polyester Textured Yarn from Indonesia, Malaysia, Thailand, and the Socialist Republic of Vietnam, Antidumping Duty Orders*; 86 Fed. Reg. 71,031 (Dep't of Commerce Dec. 14, 2021) (P.R. 249).  The period of investigation is October 1, 2019, through September 30, 2020.

**II.      Issues Presented For Review**

1.       Whether APF failed to exhaust administrative remedies regarding its objections to Commerce's verification conducted pursuant to 19 U.S.C § 1677m(i).

2.       Whether Commerce's determination to apply total facts available with an adverse inference (AFA) for APF's failure to cooperate by not acting to the best of its ability to comply with Commerce's informational requests is supported by substantial evidence and in accordance with law.

**STATEMENT OF FACTS**

On October 28, 2020, Commerce received a petition seeking the imposition of

---

[1] Citations to public and confidential documents from the administrative record are identified as "P.R.___" and "C.R.____," respectively.

antidumping duties on polyester textured yarn (yarn) from Indonesia, filed on behalf of Unifi

Manufacturing, Inc. (Unifi) and Nan Ya Plastics Corporation, America (Nan Ya) (together,

petitioners).  *See* Antidumping and Countervailing Duty Petitions (October 28, 2020) (Petition)

(P.R. 1-P.R. 6),  (C.R. 1-C.R. 6).  On November 23, 2020, Commerce initiated this antidumping

duty investigation on yarn from Indonesia.  *See Polyester Textured Yarn from Malaysia,*

*Thailand, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value*

*Investigations*, 85 Fed. Reg. 74,680 (Dep't of Commerce Nov. 23, 2020) (*Initiation Notice*) (P.R.

32).

At initiation, Commerce stated that it would, if necessary, select respondents based on

U.S. Customs and Border Protection (CBP) entry data during the period of investigation for

specified U.S. Harmonized Tariff Schedule of the United States subheadings listed in the scope

of the investigation.  *Id*.  Based on its analysis of CBP data and the parties' comments,

Commerce selected APF as a mandatory respondent.  *See* Respondent Selection Memorandum at

5-6 (Dec. 7, 2020) (P.R. 40), (C.R. 14).  On the same day, Commerce issued the initial

antidumping duty (AD) questionnaire, in which Commerce instructed APF as follows:

> In each of your answers, please identify your source of information. Please
> include with your response copies of source documents necessary to
> understand your response. For additional information sources not included
> in your response, indicate the location where the documents or electronic
> data systems are maintained. { . . . } This information is used by
> Commerce to prepare for **verification**.

*See* APF Initial Questionnaire at G-4, ¶ 6 (Dep't Commerce December 7, 2020) (emphasis in

original) (IQ) (P.R. 38).  At the outset of this investigation, Commerce cautioned APF that "{a}ll

information submitted may be subject to verification.  Failure to allow full and complete

verification of any information may affect the consideration accorded to that or any other

verified or non-verified item in the responses."  *Id*. at G-9.

On December 23, 2020, and January 11 and January 26, 2021, APF requested that

Commerce extend the time for it to file initial questionnaire responses. *See* APF's Request for

Extension, December 23, 2020 (P.R. 51) (requesting a one-week extension "to enable U.S.

counsel and Asia Pacific to finalize the Section A Response while their respective offices are

closed during the upcoming holidays."); Sections B-D Extension Request, January 11, 2021

(P.R. 62) (requesting a two-week extension to prepare and finalize its sales and costs databases,

along with the accompanying worksheets and reconciliations); and Second Section D Extension

Request, dated January 26, 2021 (P.R. 72) (requesting a 10-day extension to "enable Asia Pacific

to devote its full attention to preparation of the Section D Response {…}.").

Commerce granted each of APF's extension requests. *See* Request for Extension Letter

(Dec. 23, 2020) (P.R. 52); Sections B-D Extension Request Letter (Dep't Commerce January 11,

2021) (P.R. 62); and Section D Extension Request (Jan. 26, 2021) (P.R. 74).  Thereafter, APF

submitted its responses to questionnaire sections A – C.  *See* Section A Response, dated January

5, 2021 (P.R. 57 – P.R. 58); Sections B-C Response, dated January 28, 2021 (P.R. 76).

On February 1, 2021, APF requested a third extension to submit its section D

questionnaire response.  *See* Section D Extension Request, dated February 1, 2021 (P.R. 77)

(requesting an extension to submit its section D response and cost reconciliation).  According to

APF, it required a three-day extension to submit its section D response and cost reconciliation, in

addition to the three weeks of extended time Commerce already granted it, because:

> Asia Pacific's chief accountant was out of the office for several weeks
> after contracting the COVID-19 virus, and was unable to assist with
> preparation of the Section D Response.  The company's chief accountant
> returned to the office late last week and has been working closely with
> U.S. counsel and its consultant to prepare the factors of production
> database, cost reconciliation, and accompanying worksheets.  His absence
> in prior weeks has delayed preparation of the response, and the requested
> extension will enable Asia Pacific to finalize the Section D Response now

that he has returned to work.

*Id*. at 2.  Commerce again granted APF's request.  *See* Section D Second Extension Request

(Feb. 1, 2021) (P.R. 79) (notifying APF that "Commerce will not grant further extensions of this

deadline due to statutory constraints.").

On February 9, March 11, April 2, April 30, and May 12, 2021, Commerce issued

supplemental questionnaires.  *See* Supplemental Questionnaire (Dep't Commerce February 9,

2021) (P.R. 82) (C.R. 33) (SQ); First Supplemental Section D Questionnaire (Dep't Commerce

March 11, 2021) (P.R. 100) (C.R. 109) (FSDQ); Second Supplemental Questionnaire (Dep't

Commerce April 2, 2021) (P.R. 115) (C.R. 125) (SSQ); Second Supplemental Section D

Questionnaire (Dep't Commerce April 30, 2021) (P.R. 155) (C.R. 196) (SSDQ); Third

Supplemental Questionnaire (Dep't Commerce May 12, 2021) (P.R. 163) (C.R. 203) (TSQ).  In

these questionnaires, Commerce sought certain additional and clarifying information to support

the cost and sales data APF had reported to Commerce.  *See generally*, SQ at 3-12; FSDQ at 3-

10; SSQ at 3-14; SSDQ at 3-7; TSQ at 3-4.

On February 22, March 17, March 24, April 15, May 5, and May 14, 2021, Commerce

granted APF's requests to extend the time to file supplemental questionnaire responses.  *See*

Supplemental Questionnaire Extension Request Letter (Feb. 22, 2021) (P.R. 90); Section D

Supplemental Questionnaire Extension Request Letter (March 17, 2021) (P.R. 106); Section D

Second Supplemental Questionnaire Extension Request Letter (March 24, 2021) (P.R. 108);

Second Extension Request for Asia Pacific's Supplemental Sections A-C Questionnaire

Response (April 15, 2021) (P.R. 132); Section D Second Supplemental Questionnaire Extension

Request (May 5, 2021) (P.R. 157); Third Supplemental Questionnaire Extension Request (May

14, 2021) (P.R. 166).

In its extension letters, Commerce notified APF that its proceedings are controlled by statutory deadlines which are mandatory, not optional, and therefore, the grant of further extension requests is limited pursuant to those deadlines.  *Polyester Textured Yarn From Indonesia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Postponement of Preliminary Determinations in the Less-Than-Fair-Value Investigations*, 86 Fed. Reg. 17,362 (Dep't of Commerce April 2, 2021) (postponing the preliminary determination "due to the lack of time to collect, analyze, and follow up on questionnaire responses from the mandatory respondents.").  As a result of these extensions, APF was still submitting supplemental questionnaire responses up to a week before the preliminary determination statutory deadline, which had been fully extended.  *See* Third Supplemental Sections A-C Response, dated May 19, 2021 (TSQR) (P.R. 167); *see also* Initial Section D Questionnaire Response, dated February 9, 2021 (IDQR) (P.R. 81) (C.R. 34, C.R. 35- C.R. 36);  First Supplemental Section D Questionnaire Response, dated March 30, 2021 (FSDQR) (P.R. 111) (C.R. 122); Second Supplemental Section D Response, dated May 11, 2021 (SSDQR) (P.R. 162) (C.R. 200, C.R. 201 – C.R. 202).

On June 3, 2021, Commerce published its preliminary determination.  *See Polyester Textured Yarn from Indonesia:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 29,742 (Dep't of Commerce June 3, 2021) (Preliminary Determination) (P.R. 186), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 170).  In the preliminary determination, Commerce relied on the data reported by APF in its questionnaire and supplemental questionnaire responses.  *See* PDM at 12-20; *see also* Preliminary Determination Margin Calculation for PT. Asia Pacific Fibers Tbk (May 26, 2021) (P.R. 178) (C.R. 216) (APF Preliminary Calculation Memo).  Commerce also notified parties that it intended to verify the

information relied upon in making its final determination pursuant to 19 U.S.C. § 1677m(i)(1).

*See* Preliminary Determination, 86 Fed. Reg. at 29,744.  Commerce acknowledged that, although

it normally verifies information through an on-site examination of original accounting, financial,

and sales documentation, "due to current travel restrictions in response to the global COVID-19

pandemic, Commerce is unable to conduct on-site verification in this investigation."  *Id*.

Accordingly, Commerce stated that it intended "to verify the information relied upon in making

the final determination through alternative means in lieu of an on-site verification."  *Id*.  Pursuant

to APF's request, Commerce also postponed the final determination for the maximum statutory

period.  *Id*. at 29,744; *see also* Request to Postpone the Final Determination, dated April 30,

2021 (P.R. 154).  Commerce calculated a preliminary weighted-average dumping margin for

APF of 9.20 percent.  *See* Preliminary Determination, 86 Fed. Reg. at 29,743.

On June 15, 2021, Commerce issued a supplemental section D questionnaire to APF

regarding the responses APF had submitted to Commerce prior to the deadline for the fully-

extended preliminary determination.  *See* Third Supplemental Section D Questionnaire (Dep't

Commerce June 15, 2021) (P.R. 197) (C.R. 257) (TSDQ).  On June 22, 2021, APF timely

responded.  *See* Submission of Third Supplemental Section D Response, dated June 22, 2021

(P.R. 203) (C.R. 258) (TSDQR).

On July 9, 2021, Commerce issued the in lieu of on-site verification questionnaire.  *See*

In Lieu Of Verification Questionnaire (July 9, 2021) (ILOVQ) (P.R. 211).  On July 15, 2021, in

response to APF's extension request, which cited as the cause the COVID-19 situation in

Indonesia, Commerce withdrew its verification questionnaire, noting that it intended to issue

another "at a later date, to which {APF} will be required to respond."  *See* Withdrawal of

Verification Questionnaires (July 15, 2021) (P.R. 216) (C.R. 263).  Nearly one month later, on

August 4, 2021, Commerce issued another verification questionnaire.  *See* Revised In Lieu of Verification Questionnaire (Aug. 4, 2021) (P.R. 217) (C.R. 264) (Revised ILOVQ).  In the verification questionnaire, Commerce sought additional and supporting documentation related to the cost and sales data APF had already reported to Commerce and which was necessary for Commerce to verify APF's sales and cost data.  *Id*. at 1.

After seeking eleven extensions to file responsive information, APF requested yet another extension, this time to file its verification questionnaire response, stating that "the continuation of the lockdown in Indonesia does not mean that {APF} cannot respond to the questionnaire, but it does mean that it is a slow and laborious challenge that requires more time than would ordinarily be the case. {…} {W}e commit to responding in full to the questionnaire without any further requests for extension."  *See* Extension Request for Revised Questionnaire, dated August 10, 2021 (P.R. 219) at 2-3 (Twelfth Extension Request).  On August 11, 2021, Commerce partially granted APF's request, noting that for certain questionnaire sections, APF has "now had over one month to complete these sections."  *See* Revised In Lieu of Verification Questionnaire Extension Request (Aug. 11, 2021) (P.R. 220).  Thereafter, APF responded.  *See* Submission of Response to the Revised Questionnaire in Lieu of Verification, dated August 13, 2021 (ILOVQR) (P.R. 221) (C.R. 266 – C.R. 270).

On August 31, 2021, Commerce issued a briefing schedule for parties to submit case and rebuttal briefs.  *See* Briefing Schedule (Aug. 31, 2021) (P.R. 223).  APF did not submit an affirmative case brief.  After requesting an extension, APF submitted a rebuttal brief in response to the petitioners' case brief, which argued that total facts available with adverse inferences should be applied to APF for its failure to provide Commerce with the information and documentation to support its reported data.  *See* Submission of Administrative Rebuttal Brief,

dated September 21, 2021 (P.R. 235) (C.R. 283) (Rebuttal Brief); *see also* Petitioners' Case

Brief Concerning Asia Pacific Fibers, dated September 10, 2021 (Petitioners' Case Brief) (P.R.

228) (C.R. 281); Request for an Extension of Time to Submit Asia Pacific's Rebuttal Brief, dated

September 15, 2021 (P.R. 229) (requesting a five-day extension); Extension for Submission of

Rebuttal Briefs (Sept. 16, 2021) (P.R. 231) (extending deadline to September 20, 2021).

On October 25, 2021, Commerce published its final determination.  *See Polyester

Textured Yarn from Indonesia: Final Affirmative Determination of Sales at Less Than Fair

Value*, 86 Fed. Reg. 58,875 (Dep't of Commerce Oct. 25, 2021) (Final Determination) (P.R.

244), and accompanying Issues and Decision Memorandum (IDM) (P.R. 240).  In the final

determination, Commerce again acknowledged that it was unable to conduct on-site verification,

but "took additional steps in lieu of an on-site verification to verify the information relied upon

in making this final determination, in accordance with {19 U.S.C. § 1677m(i)}."  *See* Final

Determination, 86 Fed. Reg. at 58,875.  Commerce also confirmed that it had, in the Issues and

Decision Memorandum, addressed all issues raised by parties in their case and rebuttal briefs and

discussed changes from the preliminary determination including the application of total facts

available with adverse inferences to APF, pursuant to 19 U.S.C. §§ 1677e(a)(1) –

1677e(a)(2)(A)-(D) and 19 U.S.C. § 1677e(b), based on the fact that APF's cost and sales data

could not be verified and thus were unreliable because APF failed to provide the information and

documentation that was necessary to support this data.  *Id*.; IDM at 3.  In the final determination,

Commerce assigned APF a margin based on total adverse facts available of 26.07 percent.  *Id*. at

58,876; *see also* Final AFA Memorandum (Oct. 18, 2021) (P.R. 238) (C.R. 284) (AFA Memo).

Commerce also issued a deadline for parties to submit ministerial error allegations.  *See* Deadline

to File Ministerial Error Comments (Oct. 21, 2021) (P.R. 243).

APF submitted comments following Commerce's issuance of the final determination. *See* Application of Adverse Facts Available to PT. Asia Pacific Fibers Tbk., dated October 25, 2021 (P.R. 245) (Post-Final Comments). Thereafter, APF brought this action to challenge certain aspects of Commerce's final determination. *See* ECF Nos. 1, 8.

## **SUMMARY OF THE ARGUMENT**

Commerce's final determination is supported by substantial evidence and in accordance with law, and APF's arguments fail to demonstrate otherwise.

First, APF primarily argues against Commerce's application of total adverse facts available. In so doing, APF objects to Commerce's verification methods. However, APF failed to exhaust its administrative remedies with respect to this issue. Throughout the investigation, APF had the opportunity to object to Commerce's in lieu of on-site verification methods but failed to do so. And it never filed a case brief with Commerce objecting to Commerce's methods. APF's silence deprived Commerce of an opportunity to consider and address the issues APF now raises, for the first time, on appeal to this Court. Moreover, no exceptions to the exhaustion requirement apply. Accordingly, the Court should not consider APF's objections to Commerce's verification. Regardless, Commerce's in lieu of on-site verification in this investigation is in accordance with law.

Second, this Court should sustain Commerce's application of total adverse facts available. Commerce lawfully used facts otherwise available because APF reported data to Commerce but failed to provide critical supporting information, as Commerce requested, throughout the investigation and at verification. Accordingly, Commerce could not rely on APF's cost and sales data in the final determination. APF's failure to provide Commerce with the requested information after numerous opportunities to do so, including at verification,

demonstrates a failure to cooperate.  Thus, Commerce lawfully selected an adverse inference from among facts otherwise available.  APF's arguments to the contrary are unpersuasive. Commerce requested the supporting information throughout the investigation and it was APF's burden to ensure its data could be verified.  That Commerce could not verify its data was a result of APF's failure to comply with Commerce's informational requests, even after Commerce granted it twelve extensions to respond and extended the deadline for the final determination to the statutory maximum.

Accordingly, this Court should deny APF's motion for judgment on the agency record and sustain Commerce's final determination.

## ARGUMENT

### I.     Legal Standards

#### A.     Standard Of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C.        § 1516a(b)(1)(B)(i)).  "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).

"'Substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Crawfish Processors All. v. United States*, 483 F.3d 1358, 1361 (Fed. Cir. 2007) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) ("{s}ubstantial evidence is more

than a mere scintilla") (alteration in original); *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009).  Crucially, "{e}ven if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) (citing *Fujitsu Gen. Ltd.*, 88 F.3d at 1044).  "{T}he court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citations and internal quotations omitted) (second alteration in original).  Thus, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions.  *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984) (citation omitted).  The agency's conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion.  *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992).

The Court's "review is limited to the record before Commerce," *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1385 (Fed. Cir. 2014), and "the burden of creating an adequate record lies with {interested parties} and not with Commerce."  *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (internal citation and quotations omitted) (alteration in original).

**II.     APF's Challenge To Commerce's Verification Methods Should Be Dismissed
          Because APF Failed To Exhaust Administrative Remedies**

APF objects to Commerce's method of verification in this investigation.  APF Br. at 7-8,

13-17, 13 (asserting that "{i}n the absence of an actual on-site verification, Commerce had an

obligation to simulate the procedures{.}").  However, the Court should not consider APF's

challenge because APF has not, until now, commented on  Commerce's verification.  As such,

APF has failed to exhaust administrative remedies, and no exception to the exhaustion doctrine

applies.  Accordingly, consistent with 28 U.S.C. § 2637(d), the Court should dismiss APF's

challenge to Commerce's verification.

**A.     Legal Framework For Exhaustion Of Administrative Remedies**

Congress has directed that "the Court of International Trade shall, where appropriate,

require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  The statute "indicates

a congressional intent that, absent a strong contrary reasoning, the court should insist that parties

exhaust their remedies before the pertinent administrative agencies."  *Boomerang Tube, LLC

TMK IP-SCO v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing *Corus Staal BV v.

United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)).  Additionally, Commerce's regulations

specifically require a party raise all arguments in a timely manner before the agency.  *See Prime

Time Com. LLC v. United States*, 495 F. Supp. 3d 1308, 1313-14 (Ct. Int'l Trade 2021) (citing

*Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (internal citation omitted);

*Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383 (Fed. Cir. 2008); *ABB, Inc. v.

United States*, 920 F.3d 811, 818 (Fed. Cir. 2019)); *Corus Staal*, 502 F.3d at 1379 (citing 19

C.F.R. § 351.309(c)(2)).  Commerce's regulations also address the requirement that parties

submit a case brief that contains all the arguments which the submitters view to be relevant to the

final determination.  *See* 19 C.F.R. § 351.309(c)(2).

The purpose of the exhaustion requirement as a prerequisite to judicial review is to protect administrative agency authority and promote judicial efficiency by acknowledging that an agency should have an opportunity to correct mistakes with respect to the law it administers before it is brought into federal court.  *See Corus Staal*, 502 F.3d at 1379-80 (citing *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)); *see also Clearon Corp. v. United States*, 800 F. Supp. 2d 1355, 1362 (Ct. Int'l Trade 2011).  As such, the Court "generally takes a 'strict view' of the requirement that parties exhaust their administrative remedies before the Department of Commerce in trade cases."  *Corus Staal*, 502 F.3d at 1379.

### B.    APF Did Not Challenge Commerce's Verification Before The Agency

APF failed to exhaust its administrative remedies before Commerce with respect to its challenge to Commerce's verification.  As early as the preliminary determination, Commerce notified parties that it intended to verify in accordance with 19 U.S.C. § 1677m(i)(1), and acknowledged that, although it "{n}ormally { … } verifies information using standard procedures, including an on-site examination of original accounting, financial, and sales documentation," it was "unable to conduct on-site verification" due to travel restrictions resulting from the global COVID-19 pandemic.  *See* Preliminary Determination, 86 Fed. Reg. at 29,744.  Commerce also notified parties, including APF, that it intended "to verify the information relied upon in making the final determination through alternative means in lieu of an on-site verification."  *Id*.  Yet, despite APF's position before this Court, the administrative record is absent of any indication that APF commented on the verification methodology.  *See generally, e.g.,* ECF No. 17.  Nor does the administrative record contain indication of APF's position that, "{i}n the absence of an actual on-site verification, Commerce had an obligation to

simulate the procedures, which provide for substantial interaction between verifiers and company officials."  APF Br. at 13.

APF failed to raise its newly found objection to Commerce's verification during the investigation even though it had many opportunities to do so.  For instance, following the preliminary determination, petitioners specifically commented on APF's cost reporting and acknowledged Commerce's recent practice to issue an in lieu of on-site verification questionnaire.  *See* Petitioners' Pre-Questionnaire In Lieu Of Verification Comments on Cost-Related Issues Regarding Asia Pacific, dated July 2, 2021 (Petitioners' Pre-Questionnaire Comments) (P.R. 208) (C.R. 261) at 2.  The petitioners commented that "consistent with on-site verifications, {Commerce} should instruct {APF} to support its responses with source documentation, including screenshots from its accounting system and accounting ledgers, and copies of other relevant original source documentation { . . . } ."  *Id*. at 3.  Although the petitioners conveyed their positions on how verification should be conducted, APF remained silent.  Namely, APF never conveyed its view that the in lieu of an on-site verification questionnaire was insufficient.  *See e.g.*, APF Br. at 14 (asserting that a "proxy 'verification' took place through the issuance of a questionnaire"); *id*. at 16 ("the procedures established by Commerce were not designed to simulate an actual verification as closely as possible, and were therefore insufficient for an antidumping investigation.").

On July 9, 2021, and August 4, 2021, Commerce issued the in lieu of on-site verification questionnaire to APF.[2]  In the verification questionnaire, Commerce explained that: "{w}e are

---

[2] Commerce withdrew its initial in lieu of on-site verification questionnaire after APF and the other respondent filed requests for extensions to respond, citing the COVID-19 circumstances in Indonesia.  One month later, on August 4, 2021, Commerce reissued the verification questionnaires.  *See* Revised ILOVQ.

issuing the enclosed request for documentation, in lieu of performing an on-site verification, to collect additional or supporting documentation related to information that you have already submitted in this investigation."  *See* Revised ILOVQ at 1; *see also* ILOVQ at 1.  Additionally, Commerce cautioned APF that:  "**\*\*\*Due to the nature of this ILOV questionnaire, specifically that Commerce officials are not on site, please make sure to err on the side of over inclusion.**"  *Id*. at 4 (emphasis in original). Commerce instructed that:

> If you are not sure how to respond to one of our inquiries; have questions about whether related documents or information can be submitted, or are unable to respond completely to any of the requests in the enclosure, please contact the Commerce officials in charge of this case before submitting your response.

*Id*. at 1.  Raising no issue with the method, APF responded to Commerce's verification questionnaire after Commerce granted APF an extension.  *See e.g.*, ILOVQR; Twelfth Extension Request.

On September 1, 2021, Commerce issued its administrative briefing schedule and invited parties to submit administrative case and rebuttal briefs to address verification questionnaire responses and any and all issues parties had with the proceeding.  *See* Briefing Schedule; *see also* 19 C.F.R. § 351.309.  APF again raised no issue with the sufficiency of the verification questionnaire method.  In fact, APF did not even file an affirmative case brief.  And in its rebuttal brief to rebut the petitioners' argument that Commerce could not rely on APF's reported data because it could not be verified, APF again remained silent on its apparent view that the questionnaire method was insufficient.  *See* APF Rebuttal Brief; *see also* Petitioners' Case Brief (P.R. 228).  Despite numerous opportunities to do so, APF never commented on or objected to Commerce's verification process.  Even after Commerce issued its final determination which specifically outlines APF's verification failures and its decision to use total adverse facts

available, APF remained silent commenting in an unsolicited post-final submission only that it opposed Commerce's application of total AFA.  *See* Post-Final Comments (P.R. 245).

APF also challenges the fact that Commerce did not issue a verification report.  APF Br. at 17.  APF contends that it was "kept in the dark because the agency did not produce a verification report."  *Id*.  Again, APF did not object to Commerce's verification methods during the investigation, nor did it contend that Commerce was required to issue a verification report. *Id*.  Regardless, the Uruguay Round Trade Agreement Statement of Administrative Action (SAA), H.R. Doc. No. 103-316 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, and Commerce's regulations require Commerce to "report the methods, procedures, and results of a verification," and Commerce did so.  *See* SAA at 868; *see also* 19 C.F.R. § 351.307(c).  The verification questionnaire, APF's responses, and the detailed final determination addressing these responses were reported on the administrative record and were transparent.  APF did not argue before Commerce that its reporting requirement was not satisfied.  APF has failed to recognize that the "methods {and} procedures," – electronic issuance and questions contained in the verification questionnaires, and the "results" of the verification – APF's responses to the questionnaires, and the final determination are on the record of the investigation.

To the extent 19 C.F.R. § 351.307(c) requires Commerce to issue a separate "report", the Federal Circuit held in *PAM S.p.A. v. United States*, 463 F.3d 1345, 1349 (Fed. Cir. 2006) that the agency can relax or modify regulatory requirements if there is no substantial prejudice to any party.  Here, in the midst of a global COVID-19 pandemic, Commerce exercised its discretion and modified certain regulatory requirements to ensure that verification was conducted.  A formal verification report is not necessary when all verification questionnaires and responses were placed directly on the record.  Although APF claims that "{h}ad Commerce issued a

17

verification report, {APF} would have had an opportunity to comment on the agency's findings," *see* APF Br. at 17, Commerce explained in the verification questionnaire, "after an on-site verification, interested parties do not have an opportunity to submit factual information rebutting information collected by Commerce at verification," but that parties may address the information in case and rebuttal briefs. Revised ILOVQ at 2. The petitioners did just that, addressing the information collected from APF at verification in its administrative case brief and arguing that Commerce should apply total facts available with adverse inferences because of APF's verification failures. *See* Petitioners' Case Brief at 5-30. However, APF failed to object to Commerce's verification methods in its rebuttal brief. Finally, APF ignores the fact that it had requested no fewer than twelve extensions to file its questionnaire responses, including an extension request to submit its "full" verification questionnaire response. As a result, APF's verification questionnaire deadline was September 21, 2021—one month before the fully-extended deadline for the final determination *pursuant to statute*. Given the accommodations made by Commerce to APF, there is no substantial prejudice to APF here and APF had an opportunity to object to Commerce's verification in a case or rebuttal brief. Here again, Commerce was deprived of the opportunity to address APF's argument because APF failed to exhaust its administrative remedies.

APF cannot argue that it did not have an opportunity to comment on Commerce's verification, or raise the objections it now raises, during the investigation. During Commerce's investigation, APF could have made the comments it has now made before the Court, such as suggesting that Commerce's verification "simulate an actual verification as closely as possible," *see* APF Br. at 15, or that Commerce conduct a virtual verification or issue a verification report. *Id*. at 15, 17. APF could have indicated its contentions that Commerce's verification "lacked all

critical elements of an on-site verification," and that "the procedures established by Commerce were not designed to simulate an actual verification as closely as possible, and were therefore insufficient for an antidumping investigation." *Id*. at 15, 16. But APF did not do so. In fact, as noted above, APF did not even file an administrative case brief under 19 C.F.R. § 351.309(c) and its rebuttal brief, which is limited to responding to arguments raised in case briefs (19 C.F.R. § 351.309(d)(2)), also lacks any challenge to Commerce's in lieu of on-site verification methods or lack of verification report. *See e.g.*, Rebuttal Brief.

APF's silence on these issues is only explainable by the simple fact that APF's interests changed when a decision unfavorable to it resulted from its own failure to provide documentation to verify its data and questionnaire responses. Even if the Court were to agree with any of the arguments now raised by APF, which it should not, a remand on this issue would conflict with the very purpose of exhaustion, depriving the agency of the opportunity to consider the issue in the first instance and apply its expertise to rectify administrative mistakes or provide adequate explanation on the record in advance of judicial review. *Nucor Corp. v. United States*, 286 F. Supp. 3d 1364, 1377 (Ct. Int'l Trade 2018) (explaining that "absent exceptional circumstances… it would be inconsistent with the purposes of the exhaustion doctrine to require Commerce to explain a challenge… that was not raised at the administrative level") (internal citations omitted). As such, the Court should not allow APF to benefit from its failure to follow the well-established administrative doctrine of exhaustion and the mandates of Commerce's regulation. *See* 19 C.F.R. § 351.309(c).

Although APF's challenge attempts to circle a legal question, whether Commerce satisfied its statutory requirement under 19 U.S.C. § 1677m(i) to conduct verification, the issue requires application of Commerce's expertise for developing verification procedures and further

development of the factual record.  APF argues that "lack of an 'on-site' verification unfairly

denied {APF} the opportunity explain or clarify {…} and to provide corrective information,"

and that "{i}n the absence of an actual on-site verification, Commerce had an obligation to

simulate the procedures, which provide for substantial interaction between verifiers and company

officials."  *See* APF Br. 13.  Thus, APF alleges that Commerce arbitrarily departed from its

established verification practices without justification.  *Id*.

       This is simply untrue.  As APF recognized, the global pandemic precluded on-site

verification and, as such, Commerce exercised its discretion to conduct verification through

verification questionnaires.  *See* APF Br. at 16; *see also Taian Ziyang Food Co., Ltd. v. United*

*States*, 918 F. Supp. 2d 1345, 1363 (Ct. Int'l Trade 2013) ("Courts are indulgent toward

administrative action to the extent of affirming {a determination} where the agency's path can be

'discerned'…") (internal citations omitted)).  To the extent that APF argues that it was unfairly

denied an opportunity to cure verification deficiencies with further explanation or corrective

information, this Court has construed 19 U.S.C. § 1677m(d), providing for an opportunity to cure

deficiencies, as inapplicable to deficiencies discovered at verification, *see Hung Vuong Corp. v.*

*United States*, 483 F. Supp. 3d 1321, 1355 (Ct. Int'l Trade 2020), and that "{v}erification

represents a point of no return" – that is, verification is not intended as an opportunity to submit

new factual information.  *See Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343-44 (Fed.

Cir. 2021) ("The purpose of verification is 'to test information provided by a party for accuracy

and completeness.'") (citation omitted).

       Further, analysis required to resolve APF's challenge requires a factual record of

Commerce's past practice and an assessment of Commerce's justifications for any departure

from that past practice on an issue for which this Court has granted Commerce "considerable

latitude" in developing.  *Cf. Consolidated Bearings v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003).  The Federal Circuit in *Consolidated Bearing* explained that a challenge to Commerce's liquidation instructions as a departure from prior practice does not qualify as a "pure question of law" because the allegations would "require a factual record of Commerce's past practice and an assessment of Commerce's justifications for any departure from that past practice."  *Id.* (differentiating the "pure question of law" exception to exhaustion from the fact that Commerce did not have an administrative process available to challenge the liquidation instructions.)

A separate yet intertwined basis for denying APF's claims is its failure to raise these issues in its administrative case brief violated 19 C.F.R. § 351.309, which requires parties to submit case briefs containing all the arguments the submitter views relevant to the final determination.  This court has recognized a violation of section 351.309 as a separate basis for denying a plaintiff's motion.  *See Corus Staal*, 502 F.3d at 1379 (explaining that in the context of 19 C.F.R. § 351.309 the exhaustion requirement "is therefore not simply a creature of court decision, as is sometimes the case, but is a requirement explicitly imposed by the agency as a prerequisite to judicial review"); *see also Samsung Elecs. Co. Ltd., v. United States*, 72 F. Supp. 3d 1359, 1371 (Ct. Int'l Trade 2015) ("A violation of Commerce's regulation, therefore, supplies an independent ground for determining that an argument has not been exhausted.").  As discussed above, APF failed to submit an administrative case brief, and its rebuttal brief, which was by regulation limited to responding to arguments raised in case briefs, did not raise any objection to Commerce's verification methods.  Therefore, APF failed to convey any of the allegations it currently levies against Commerce with regard to the verification conducted during this investigation.

Because APF failed to exhaust its administrative remedies, the Court should dismiss APF's arguments on this matter in accordance with 28 U.S.C. § 2637(d).  Additionally, APF's failure to raise the issues in an administrative case brief violated 19 C.F.R. § 351.309 and is a separate basis for denial.

### C.   Commerce's Verification Was Consistent With The Statute And Necessary As A Result Of The COVID-19 Pandemic

Even were the Court to find that APF exhausted its administrative remedies or that an exception to exhaustion applies, which it should not, APF fails to show how Commerce's verification methods were contrary to law or an abuse of Commerce's discretion considering the global pandemic.

Commerce did conduct an off-site verification using the in lieu of on-site verification questionnaire.  On July 9, and August, 11, 2021, Commerce issued questionnaires soliciting information from APF in lieu of performing an on-site verification.  *See* ILOVQ; Revised ILOVQ.  Commerce explained:   "We are issuing this questionnaire in lieu of performing an on-site verification, to collect additional or supporting documentation related to information that you have already submitted in this investigation.  As with requests for documentation for on-site verifications, this is not a request for new information."  *Id*. at 1; *see also* ILOVQ ("The purpose of this questionnaire is to probe information that you have already submitted – not to obtain new information.  Accordingly, the questions are similar to those that {Commerce} would normally ask during an on-site verification.").  Commerce further explained that "{n}ormally, after an on-site verification, parties do not have an opportunity to submit factual information rebutting information collected by Commerce at verification.  Accordingly, Commerce will not accept factual information from other interested parties to rebut your questionnaire responses."  *Id*. at 2; *see also id.* at 1 (discussing how, under Commerce's regulations, unsolicited new factual

information cannot be submitted during verification and how "responses indicating that information previously submitted cannot be verified – may result in the application of partial or total facts available").  Commerce conducted verification through the questionnaire.

Moreover, 19 U.S.C. § 1677m(i) does not include any on-site requirements.  The statute only requires, in relevant part, that "{t}he administering authority shall verify all information relied upon in making – (1) a final determination in an investigation {…}," which is consistent with the methodology Commerce used here.  Nor do Commerce's regulations require on-site verification.  *See* 19 C.F.R. § 351.307.

The statute gives Commerce wide latitude in its verification procedures; therefore, Congress has implicitly delegated to Commerce the latitude to derive verification procedures *ad hoc*.  *Goodluck India*, 11 F.4th at 1343-44.  Commerce's use of detailed questionnaires, in light of the exigencies and restrictions caused by the global COVID-19 pandemic, complied with the statutory mandate to verify information.  The SAA referencing both investigations and administrative reviews states that "{a}s under existing practice, *where practicable*, verification will be conducted after receipt of all questionnaire responses."  *See* SAA, H.R. Doc. No. 103-316, at 868 (emphasis added).  Here, after the receipt of all questionnaire responses, Commerce conducted verification by issuing the verification questionnaires.

Additionally, alternatives to on-site verification by Commerce have been recognized as a lawful "compromise" when on-site verification requested during an administrative review was not conducted, in part, because of exigent circumstances, such as the outbreak of the Persian Gulf war and the attendant risk to international travel.  *Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (acknowledging Commerce's compromise option, such as conducting off-site verifications).   APF's arguments that Commerce failed to conduct

verification or conducted an unlawful verification should be rejected.  Commerce received

extensive responses from mandatory respondents which support Commerce's development and

use of the in lieu of on-site verification questionnaire as an alternative means of verification

during which it obtained the type of information it would during an on-site verification, and

neither the statute nor Commerce's' regulations require verification to occur on-site or

"simulate" on-site procedures.  APF Br. at 13.

III.   **Commerce's Final Determination Is Supported By Substantial Evidence And In Accordance With Law**

Commerce acted lawfully when it applied facts otherwise available with adverse

inferences in the final determination because APF failed to cooperate by not complying with

Commerce's numerous requests for information to support the data it had reported to Commerce.

This failure rendered APF's data unreliable.  *See* IDM at 16.

A.   **Legal Framework For The Application Of Facts Otherwise Available With Adverse Inferences**

Commerce "shall rely on" the facts otherwise available on the record to fill informational

gaps when necessary information is unavailable or when an interested party withholds

information requested by Commerce, fails to provide the information by the deadline,

significantly impedes the proceeding, or provides information that cannot be verified.  *See* 19

U.S.C. § 1677e(a).  Before applying facts available, Commerce must inform a respondent of the

deficiency and allow the respondent an opportunity to explain or remedy the deficiency.  *See* 19

U.S.C. §§ 1677e(a)(2), 1677m(d).

Commerce may apply an adverse inference in its selection of facts otherwise available, if

it further finds that a respondent has "failed to cooperate by not acting to the best of its ability to

comply with a request for information."  19 U.S.C. § 1677e(b).  A respondent's failure to

cooperate to the "best of its ability" is "determined by assessing whether {a} respondent has put

24

forth its *maximum effort* to provide Commerce with full and complete answers to all inquiries." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (emphasis added). Thus, the statutory trigger for an adverse inference "is simply a failure to cooperate to the best of respondent's ability, *regardless of motivation or intent*." *Id.* at 1383 (emphasis added). To determine whether an adverse inference is warranted, Commerce examines the "respondent's actions and assesses the extent of {the} respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information." *Id.* at 1382.

When applying an adverse inference, Commerce may rely on information derived from any stage of the proceeding, including the petition, a final determination in the investigation, any previous review, or any other information placed on the record. *See* 19 U.S.C. § 1677e(b)(2); 19 C.F.R. § 351.308(c)(1)(i)-(iii). In selecting an adverse rate from among the possible sources, Commerce seeks to use a rate that is sufficiently adverse to effectuate the statutory purpose of inducing respondents to provide Commerce with complete and accurate information in a timely manner. *See Ozdemir Boru San. Ve Tic. Ltd. v. United States*, 273 F. Supp. 3d 1225, 1245 (Fed. Cir. 2017). This ensures "that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." *See* SAA, H.R. Doc. No. 103-316, at 870.

### B.    Substantial Evidence Supports Commerce's Use Of Facts Otherwise Available

APF argues that Commerce's use of facts otherwise available is not supported by the record. APF Br. at 12, 13. APF's argument is meritless. The record demonstrates that Commerce's use of facts otherwise available was lawful because APF failed to provide critical information to support its reported data, which significantly impeded the investigation and rendered the data unverifiable, and thus, unreliable. IDM at 12-16; AFA Memo at 1; *see also* 19 U.S.C. § 1677e(a).

25

APF argues that Commerce failed to articulate any basis for resorting to facts otherwise available pursuant to 19 U.S.C. § 1677e(a)(2), contending that it is "difficult to understand how {APF}'s conduct could have impeded the investigation," because "Commerce does not identify a single instance in which {APF} refused to furnish a document, failed to abide by a deadline, failed to provide a narrative response to a question or forced a shut-down of verification." APF Br. at 12.

APF is incorrect -- Commerce basis for resorting to facts available is well-reasoned and supported by substantial evidence. *See* IDM at 16, 17 (referencing AFA Memo at 1). In the final determination, Commerce explained that it "must rely on facts otherwise available pursuant to {19 U.S.C. § 1677e(a)(1)}, and {19 U.S.C. § 1677e(a)(2)(A)-(D)}." *Id*. at 16 (applying facts available based on cost data); AFA Memo at 6 (applying facts available based on sales data). With respect to APF's cost data, Commerce explained that APF failed to:

> (1) provide necessary supporting information from its production and accounting systems for the cost of intermediate raw material inputs detailed on its "cost allocation summary" worksheet, the reported per-unit chip costs, and the reported machine speeds;
> (2) account for cost differences associated with four of the product characteristics defined by Commerce; and
> (3) provide various other requested cost data related to its reported per-unit costs.

IDM at 11. Specifically, Commerce summarized that it:

> requested that {APF} provide record evidence from its accounting systems to support critical information necessary to ensure that the *starting point* for its reported per-unit costs was based on data from its normal books and records and any cost allocations used to determine the reported per-unit {costs} were based on data from its accounting and/or production systems. {APF} failed to provide the requested data, as described in detail below, which significantly impeded the proceeding and rendered the data that {APF} provided throughout the investigation unverifiable.

*Id*. at 12 (emphasis added); *see also id.* at 12-17 (detailing the information Commerce requested which APF failed to provide).  Commerce explained that "on numerous occasions," it requested APF show how the specific amounts in APF's "cost allocation summary" worksheet were determined, and to trace the amounts to the source data from the accounting system.  *Id*. at 12.

In the first supplemental questionnaire, Commerce acknowledged that APF did not have a formal cost accounting system and the production costs incurred by APF were "allocated to products produced based on various production related parameters," *see* FDSQ at 6, but requested that APF "show" how amounts in the cost allocation worksheet were calculated and how they "trace back to the source data from the accounting system."  *Id*. at 8, ¶¶ 15, 16.  In the second supplemental questionnaire, Commerce stated that because APF responded to "many questions" in the questionnaire with reference to its cost allocation worksheet which contained hardcoded figures, and not the requested calculation or underlying source data, Commerce again requested that APF "show how the amounts were calculated and how they trace back to the source data from the accounting system."  SDSQ at 5-6; *see also id*. at 8-9.  Commerce also requested that APF "{c}ross-reference the worksheet to the source data from the accounting system," "{p}rovide screenshots, trial balance reconciliations and/or any other relevant supporting documentation to validate the data provided" in its cost allocation worksheet, and "provide a roadmap showing how the amounts … tie to the reported costs."  *Id*.

As a specific example, Commerce noted that:

> 6. Commerce instructed in its 1st supplemental section D questionnaire issued on March 10, 2021, for APF to describe and demonstrate how all the cost elements in Exhibit D-8 "other direct materials and labor allocation" and Exhibit D-9 "allocation spreadsheet" relate to each other. {…} APF did not provide the information requested.

*Id*. at 5.  Commerce again asked that APF provide how all the cost elements in the exhibits relate to each other.  Additionally, Commerce again asked APF to "show how the amounts were calculated and how they trace back to the source data from the accounting system."  *Id*.  APF failed to provide the requested information.  *See* SDQR at 8-9 (stating that exhibit D-13 includes a cost allocation summary which is a summary of the trial balance and that the total cost of production in the cost allocation summary reconciles with the trial balance); *id*. at 9 ("the POI trial balances that were included in the {cost allocation worksheet} have codes for each cost account that reconcile to Exhibit Rev. D-13.").

For chip costs, APF reported that it uses different polyester chips to produce different yarns and assigns specific per kilo chip costs to chips purchased during the investigation period. IDQR (P.R. 81) (C.R. 34) at 18, and IDQR at Exhibit D-6 (C.R. 34)).  Commerce asked APF to describe and demonstrate how the cost elements in APF's raw material cost allocation and chip cost calculation worksheets flow into each other (*i.e.*, chips inventory, finished production, allocation in drawn textured yarn, per-unit purchase price of chips and raw material cost) and provide how these figures trace back to APF's accounting system.  *See* FSDQ (P.R. 100) (C.R. 109) at 6; SDSQ (P.R. 155) (C.R. 196) at 4.  In response, APF provided a revised version of its previously submitted exhibit containing spreadsheets created for the purpose of the AD investigation and limited support from its accounting system, but failed to demonstrate how the quantity and value used to calculate APF's per-unit raw material chip costs tie to its accounting system.  FSDQR (P.R. 111) (C.R. 122) at 10-11 and Exhibit SD1-11.a. and SSDQR (P.R. 162) (C.R. 200) at 5 and Exhibit SD2-4 (pure terephthalic acid (PTA) and monoethylene glycol (MEG) (the primary raw materials to produce chips) consumption for September 2020)).

Commerce gave APF another opportunity to provide the information at verification.  *See* Revised ILOVQ at 6-7.   However, APF failed to do so.  *See* IDM at 13 (explaining that APF only provided input dispatch reports for two months of the twelve-month investigation period and entirely failed to provide supporting information for transferred quantities at verification); *id*. at 15 (explaining that APF failed to provide information to support the consumption and value of chips at verification); ILOVQR at 7-9.

Commerce explained that because APF did not provide the requested information, "the only link between the CONNUM-specific raw material cost worksheets and {APF}'s books and records are the beginning and ending inventory values for polyester chips that tie to the trial balance."  IDM at 14.  Consequently, APF's consumption quantity, purchases, or transfers of polyester chips used to produce the merchandise under investigation were unsupported.  *Id*. Contrary to APF's contention that Commerce applied facts available because Commerce determined that APF did not provide an inventory movement schedule, *see* APF Br. at 20, Commerce faulted APF for its failure to show how the total investigation period consumption quantity and value of polyester chips as reflected on the inventory movement schedule tie to its accounting system despite multiple requests that it do so.  IDM at 15 (citing FDSQ at 6); *id*. at 14.

Commerce also requested information to support the machine speeds that APF used to allocate the reported conversion costs for each yarn denier range.  IDM at 15-16 (citing SSDQ at 7); *see also* SSDQR (P.R. 162) (C.R. 200) at 2.  As Commerce explained, the information is critical because machine speed is the main factor used by APF in allocating its total reported variable overhead, labor, and spares costs to specific products.  *Id*. at 15.  Commerce requested that APF correct reported denier ranges and provide detailed calculations and supporting

documentation showing how APF determined the machine meter per minute (m/min) in its spinning and texturizing phases of production.  SSDQ (P.R. 155) (C.R. 196) at 5.  Although APF revised its reported costs and provided new machine speeds, it did not provide supporting information for the new machine speeds.  *Id*. at 15-16 (citing SSDQR (P.R. 162) (C.R. 200) at 7 and Exhibit SD2-5 (revised costs and new speeds)).  Commerce gave APF another opportunity to provide supporting documentation and information at verification, again, to no avail.  *Id*. at 15 (citing Revised ILOVQ at 9).  In fact, APF responded that it had submitted screenshots of its standard production guidelines for two products identified in the questionnaire, but no such screenshots have been submitted on the record.  *Id*. (citing ILOVQR at 13-14).  Consequently, Commerce could not verify APF's reported machine speeds without supporting information. IDM at 16.

Additionally, APF failed to provide information to support its reported per-unit chemical costs and to either differentiate costs for all product characteristics defined by Commerce or properly explain, with supporting information, how the cost differences related to those product characteristics among its reported CONNUMs is insignificant.  IDM at 16.  For example, with respect to differentiating costs for certain product characteristics (*i.e.*, ply, filament, cross section and intermingling), APF repeatedly claimed that its accounting system does not track costs for those physical characteristics, but failed to provide a reasonable method to differentiate the cost differences or provide supporting documentation for its claim that the product characteristics have no impact on costs.  *Id*. at 16-17 (citing FSDQR (P.R. 111) (C.R. 122) at 21; SSDQR (P.R. 162) (C.R. 200) at 4, 10-11; TSDQR (P.R. 203) (C.R. 258) at 1).

Without supporting information, Commerce could not determine how APF's cost allocations and specific per-unit values tied to its accounting system or whether they were

accurate.  IDM at 16.  While Commerce never disputed the fact that the total cost of production reconciles to the trial balance, the issue is that the allocation bases used for allocating those total costs to the specific products were unsubstantiated by data from APF's accounting systems, production systems, or from any other relevant source (*i.e.*, engineering studies, machine times, industry standards, etc.).  As Commerce explained, "this omitted supporting information is critical because {the cost allocation summary} serves as the main informational worksheet that {APF} relied on to show how its production costs for upstream intermediate material inputs (*i.e.*, partially oriented yarn (POY), spin drawn yarn (SDY)) flow into the total POI production costs for merchandise under investigation (MUC) (*i.e.*, drawn textured yarn (DTY))." *Id.* at 12.  It was similarly imperative that APF provide Commerce with support for the quantities and values used in its direct materials worksheets.  *Id.* at 15.  Absent the requested material, Commerce could not trace the cost of raw material inputs allocated to the merchandise under investigation to source data from APF's accounting and/or production systems and thus APF's allocation methodology could not be verified.  IDM at 13.  Accordingly, Commerce concluded that "{a}s a result of the major deficiencies and reporting failures { … }, {APF}'s reported direct material costs are unusable and unverifiable."  IDM at 15.

In addition to APF's cost data deficiencies, Commerce found that the information reported in APF's sales databases could not be verified based on APF's verification questionnaire responses, which revealed substantial "inconsistencies, deficiencies, and reporting failures."  AFA Memo at 1, 7 (containing business proprietary information); *see also* IDM at 17.

For certain sales data, APF failed to submit verifiable documents including legible or translated materials; failed to provide supporting documents including materials to support its narrative explanation and calculation of inventory carrying costs, unit costs of inland freight,

brokerage and handling, and international freight, the billing and payment date for one U.S. sale, and certain quantity and value totals for home market sales; and provided supporting documentation which resulted in discrepancies from previously reported information including that for warehouse costs, the destination zip code and state for two export sales, the payment terms for three export sales, shipment dates, indirect selling expenses, packing expenses, and certain sales figures.  AFA Memo at 2-6.  For instance, in the verification questionnaire, Commerce asked APF to reconcile the January 2020 quantity and value totals for home market sales of subject merchandise to the home market sales datasets reported by APF.  *Id*. at 3.  Although APF provided [████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████].  *Id*. (citing IQR at Exhibit S1-36 (C.R. 104 (p. 162), C.R. 105); ILOVQR at Exhibit S3-2.a. (C.R. 268 (p. 213), C.R. 269).  Commerce explained that, as a result, it was "not able to verify the reported January 2020 quantity and value totals for home market sales" because of these deficiencies and inconsistencies.  *Id*. at 3-4.  Commerce also explained that because APF "had the complete sales ledger and provided only four pages despite Commerce's request," APF failed to provide critical supporting information and documentation, and as a result, APF significantly impeded the investigation.  *Id*. at 4.

In summary, Commerce explained its final determination that APF "failed to provide accurate and complete information with its verification questionnaire response, and the errors, inconsistencies, and omissions in its databases were substantial."  AFA Memo at 1; *see also* IDM at 16.  Contrary to APF's claim that Commerce failed to articulate a basis for using facts otherwise available, Commerce detailed how APF's failure to provide the requested information

significantly impeded the investigation because of the information's critical nature and because

Commerce had repeatedly attempted to collect information from APF to support APF's reported

data, to no avail.  *See* IDM at 12, 16; *see also* AFA Memo 4.  As stated in the final

determination, Commerce was unable to verify and rely on the cost and sales data APF reported

to Commerce during the investigation and thus critical information was missing from the record.

Accordingly, Commerce lawfully resorted to facts otherwise available pursuant to 19 U.S.C.

§ 1677e(1) and § 1677e(2)(A)-(D).  IDM at 16.

### C.    Substantial Evidence Supports Commerce's Application Of An Adverse Inference Based On APF's Failure To Cooperate

APF argues that Commerce's determination is unsupported by substantial evidence

because it "fully cooperated" with Commerce's investigation.  APF Br. at 15.  But APF's

repeated failure to validate its cost allocations and per-unit costs demonstrates that APF did not

cooperate, and that Commerce's application of an adverse inference was based on substantial

evidence.  IDM at 14; AFA Memo at 6-7.

Contrary to APF's assertion that its conduct and cooperation were "impeccable," APF Br.

at 14, it is well-documented that APF repeatedly failed to provide requested, necessary

supporting information.  *See* IDM at 11-17; AFA Memo at 2-4.  Noting that Commerce relied on

APF's data at the preliminary determination, APF asserts (without citing any record evidence in

particular) that its responses were "accurate and complete."  APF Br. at 14.  Commerce,

however, required supporting information to validate that APF's responses were indeed accurate

and complete.  Moreover, APF was still submitting yet-to-be verified questionnaire responses up

to one-week prior to the preliminary determination, and Commerce issued another supplemental

questionnaire regarding APF's section D responses after it issued the preliminary determination.

Thus, even though Commerce relied on APF's data at the preliminary stage, the preliminary

determination was clearly subject to change.  *See NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) ("Preliminary determinations are 'preliminary' precisely because they are subject to change.").  As acknowledged by this Court, "the purpose of verification and briefing by the parties is to enable the agency to determine dumping margins as accurately as possible."  *See Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1343 (Ct. Int'l Trade 2018) (internal quotations omitted).  Moreover, "Commerce has the flexibility to change its position" from the preliminary to the final determination provided it "explains the basis for the change."  *See Id.* (internal quotations omitted).

Commerce reasonably concluded that APF failed to provide critical supporting information for its reported cost and sales data, which the agency had requested throughout the investigation and at verification, and that APF's failure to cooperate warranted an adverse inference pursuant to 19 U.S.C. § 1677e(b).  *See* IDM at 16; *id*. at 17 ("{APF} also failed to adequately respond to Commerce's request for sales verification information."); *see also* AFA Memo at 6-7.  Having reported data for Commerce to use in the calculation of the antidumping margin and having certified to its accuracy, APF had within its possession the information upon which it derived the reported figures.  IDM at 16.  Failing to provide that information signals noncooperation.

APF now argues that it failed to provide certain requested documents because the documents did not exist.  *See* APF Br. at 14 ("{APF} produced all the documentation that existed (it could not comply with requests for accounting documents that did not exist {.}").  But APF never indicated that it did not maintain supporting records for the data it reported to Commerce.  Importantly, Commerce requested information to support the figures and data which APF had *already reported to the agency* and for which it had certified the accuracy.  While APF

notified Commerce that it did not have a formal cost accounting system, APF indicated that it did have a system for allocating costs, and documentation to substantiate that system.  While the statutory requirement that a party act "to the best of its ability { … } does not require perfection," it also "does not condone inattentiveness, careless, or inadequate record keeping." *Nippon Steel*, 337 F.3d at 1382 (emphasis added).  Commerce notified parties at the outset of the investigation that responses and data would be subject to verification.  *See* IQ (P.R. 38) at G-4, G-9; *see also* 19 U.S.C. § 1677m(i)(1). Thus, APF's position that it acted to the best of its ability to comply with Commerce's informational requests by reporting data (and certifying to its accuracy) when APF could not substantiate such data with information or documentation is unavailing.

That APF provided timely questionnaire responses and participated in verification, APF Br. at 15, is not enough to demonstrate that APF cooperated to the best of its ability.  To the contrary, respondents must exert "maximum effort to provide Commerce with full and complete answers to all inquiries{.}"  *Nippon Steel*, 337 F.3d at 1382 (describing the best of ability standard).  But the record shows that APF did not exert maximum effort, particularly in light of Commerce's numerous supplemental questionnaires requesting the same information, which APF failed to provide.  *See e.g.,* IQ (P.R. 38) at D-14 (requesting information to support product specific cost allocations and trace back to company books and records); FSDQ (P.R. 100) (C.R. 109) at 6, 8-9 (requesting product specific cost allocation support); SSDQ (P.R. 155) (C.R. 196) at 5-7 (requesting product specific cost allocation support); Revised ILOVQ at 6-9 (requesting documentation supporting product costs); IDM at 12-16 (detailing the product specific cost allocations without supporting information); *see also Nippon Steel*, 337 F.3d at 1382.  Further, APF's verification responses revealed deficiencies, errors, and inconsistencies in APF's cost and

sales data which rendered both datasets unreliable.  APF Br. at 15; *see also* IDM at 16; AFA Memo at 2-6.

APF argues that Commerce erroneously applied total adverse facts available because APF was given no opportunity to "apprise the verifiers of minor errors or to correct such errors" or to "rectify any {record} gap that Commerce may have perceived."  APF Br. at 17, 15-17.  But APF was in possession of all the data it reported to Commerce; as well as Commerce's verification questionnaire.  APF was welcome at any point to apprise Commerce of minor errors and to correct any mistakes APF had made in its reporting.

Regardless, the point of verification is to verify the accuracy of the respondent's responses and data; it is not an opportunity for submitting new factual information.  *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 353 F. Supp. 2d 1294, 1304 (2004), *aff'd*, 146 F. App'x 493 (Fed. Cir. 2005).  Here, Commerce's actions satisfy 19 U.S.C. § 1677m(d), because verification is not a "request for information."  Supplemental questionnaires are "clearly aimed at remedying deficiencies" in the respondent's questionnaire responses, *Hyundai Steel Co. v. United States*, 282 F. Supp. 3d 1332, 1348-49 (Ct. Int'l Trade 2018), whereas the point of verification is to spot check the questionnaire responses.  As detailed above, Commerce discovered numerous discrepancies in APF's questionnaire responses during verification.  Moreover, the Court has construed the statutory provision requiring that parties be notified and provided an opportunity to cure deficiencies, 19 U.S.C. § 1677m(d), as inapplicable to deficiencies discovered during verification.  *Hung Vuong Corp.*, 483 F. Supp. 3d at 1355.

If deficiencies are discovered at verification, Commerce *may* allow additional information, but it is not required to do so.  *Dongguan Sunrise Furniture Co. v. United States*, 865 F. Supp. 2d 1216, 1232 (Ct. Int'l Trade 2012) ("Although Commerce could have allowed the

submission of the data, it was not required to do so.").  Even if the facts of this case warranted

the allowance of additional information, which they do not do, Commerce was constrained to

issue the final determination before the statutory deadline, which had been fully extended as a

result of, in no small part, the mandatory respondents' requests to extend the time to respond to

nearly every one of Commerce's questionnaires.  While the respondent in *Dongguan* argued that,

following a verification which likewise uncovered discrepancies, Commerce should have

allowed it an opportunity to remedy the deficient submissions, the Court held that "Commerce is

required to provide an importer the opportunity to remedy a deficient submission only 'to the

extent practicable' in light of the time limits for reviews."  *Dongguan*, 865 F. Supp. 2d at 1231

(citing 19 U.S.C. § 1677m(d)).  Here, it was not practicable in light of the statutory deadline.

In short, Commerce reasonably applied an adverse inference in accordance with 19

U.S.C. § 1677e(b) because APF failed to act to the best of its ability by failing to provide

supporting documentation which it knew Commerce required to rely on APF's reported cost and

sales data in the final determination.  Neither APF's compliance with questionnaire deadlines nor

its provision of responses to Commerce's questionnaires demonstrates that APF did the

maximum it was able to do to comply with Commerce's requests—particularly in light of the

glaring lack of support for the information it provided in those responses.

**D.**   **APF's Arguments That Commerce Misunderstood Record Evidence Are**
**Belied By The Record And Fail To Show That Commerce's Final**
**Determination Is Unsupported By Substantial Evidence**

APF argues that Commerce's cost and sales data justification for applying AFA in the

final determination is unsupported by substantial evidence.  APF Br. at 15.  But APF's argument

is belied by the record, and there is no indication that Commerce "misunderstood" the record

evidence that APF provided.  APF Br. at 17.  With respect to APF's cost data, Commerce

acknowledged that APF did not maintain a formal cost accounting system after APF initially reported its data. *See* FSDQ (P.R. 100) (C.R. 109) at 6 ("You state that APF does not have formal cost accounting system and all production costs incurred by APF during the POI are allocated to products produced based on various production related parameters that establish the input required per kilo of production and output per day."). Nevertheless, Commerce required supporting documentation and information from APF to show how, and on what basis, APF allocated costs it had reported to Commerce. Accordingly, Commerce requested that APF identify and explain its cost allocations and provide supporting documentation based on the system APF described. *Id*. at 6, ¶ 9; *see also* IDQR (P.R. 81) (C.R. 34) at 9 ("APF records costs and expenses in cost centers that allow for the identification of certain costs for specific product types. {…} APF also maintains standard production parameters and input/output norms that it uses to develop product specific costs. . . APF relies on actual costs as recorded in the financial accounting system to derive the costs associated with production."). For instance, Commerce requested that APF "show how {i}] derived calculations for 'RM cost,' 'power,' 'spare,' 'steam,' 'depreciation,' and 'wages' for yarn products (*i.e.*, POY, SDY, DTY and intermingled textured yarn (ITY) in the cost allocation worksheet and cross-reference the amounts," "show how they trace back to the source data from the accounting system," and "if they are directly taken from your system, demonstrate how the amounts were created within the system." FSDQ (P.R. 100) (C.R.109) at 8 (requesting similar information for materials).

As Commerce explained, it requested such evidence to "ensure that the starting point for {APF}'s reported per-unit costs was based on data from its normal books and records and any cost allocations used to determine the reported per-unit {costs} were based on data from {APF}'s accounting and/or production systems." IDM at 11-12; *see also* APF Br. at 19 ("The

ultimate per-unit costs were derived from the allocation costs contained in the cost allocation summary worksheet.").   Commerce did not misunderstand or ignore APF's information— Commerce required information to support APF's cost allocation method based on the system it used to derive the figures it reported to Commerce.  IDM at 11.  Commerce must ensure the accurate calculation of antidumping duties, verify information upon which it relies, to the extent practicable, and calculate costs based on the respondent's normal books and records.  19 U.S.C. §§ 1677m(i)(1), 1677b(f)(1)(A); *Rhone Poulenc v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).  Relying on figures reported by respondents without an understanding of how they are calculated and without verifying their accuracy are contrary to these obligations.

APF argues that "it could not match the reported per-unit costs directly to its trial balance" because it did not maintain a cost accounting system from which it could report per-unit costs.  APF Br. at 18.  But Commerce did not require that APF produce a cost accounting system or that it match its per-unit costs with its trial balance.  Although APF derived its per-unit costs from cost allocations in its allocation summary worksheet, and its total costs linked *in the aggregate* to APF's trial balance, APF never provided Commerce with information to support how, and on what basis, it allocated those total costs to specific products.  IDM at 13, 16.  Again, Commerce requested information to support that the starting point for APF's reported per-unit costs was based on data from its normal books and records, and that any cost allocations used to determine the reported per-unit costs were based on data from APF's accounting and/or production systems.  IDM at 11-12.  Instead of providing the requested supporting information, APF submitted the cost allocation summary worksheet with hardcoded (*i.e.*, unverifiable) figures created for the purpose of the AD investigation.  FSDQR (P.R. 111) (C.R. 122) at Exhibit SD1-7 and SD1-11a.

In response, Commerce again requested that APF:

a. Show how the amounts were calculated and how they trace back to source data from the accounting system.  If they are directly taken from your system, demonstrate how the amounts were created within the system.

b. Cross-reference the worksheet to the source data from the accounting system. For example, show how you derived [ ▮ ] USD of "transfer cost of raw material."

c. Provide screenshots, trial balance reconciliations and/or any other relevant supporting documentation to validate the data provided at Exhibit D-13 "Cost-allocation" worksheet.  In addition, provide a road map showing how the amounts in Exhibit D-13 tie to the reported costs.

SSDQ (P.R. 155) (C.R. 196) at 6-7.  Instead of providing this information, however, APF simply reiterated that its "cost allocation summary worksheet is a summary of the POI trial balance for yarn division and that the total cost of production reconciles with the trial balance."  SSDQR (P.R. 162) (C.R. 200) at 8-9 (referring Commerce back to APF's cost allocation summary).  But, as Commerce explained, the product specific costs that APF reported in its worksheet were not actually reconciled with the trial balance or supported by source data from any accounting or production systems. IDM at 13 (emphasis added) (citing to SSDQR at 8-9, Exhibit SD1-Rev. D-13; *id*. at 9).  Consequently, APS's allocation methodology could not be verified.  *Id*.

APF argues that it submitted evidence to show that it could identify, through external reports, actual consumption costs.  APF Br. at 19.  But when Commerce requested information and source documentation from APF's accounting and/or production systems to support how, and on what basis, APF *actually* allocated costs and derived reported per-unit costs, APF did not comply with Commerce's requests.  As is well-established, the burden of creating an adequate record lies with interested parties, not with Commerce.  *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1337 (Fed. Cir. 2016).  Therefore, even if Commerce had overlooked or

misinterpreted APF's information, which Commerce did not, it was the responsibility of APF, not Commerce, to submit adequate information and evidence to clarify the record.

With respect to sales data, APF now provides a chart to supposedly demonstrate "that many of {Commerce's} alleged discrepancies were insignificant in nature." APF Br. at 23 (identifying five of Commerce's comments with respect to APF's sales data).[3] But these new sales data contentions are undeveloped, untimely, and lack a record basis.

As discussed above, Commerce found that the errors, inconsistencies, and omissions revealed by APF's verification questionnaire responses rendered APF's sales data unreliable. AFA Memo at 1; *see also* IDM at 17. Indeed, APF has identified only five instances where APF's sales data lacked verification, but Commerce's actual findings were not so limited. AFA Memo at 2-7. In fact, Commerce issued a separate seven-page memorandum, supporting its AFA finding, in conjunction with the final determination, which outlined the substantial discrepancies in APF's sales data verification responses. *Id.* These include APF's failure to submit verifiable documents, failure to submit supporting documentation, and the submission of supporting documentation resulting in discrepancies with previously reported information. *Id.* at 1-6.

---

[3] In a chart in its opening brief, APF has identified five instances of APF's sales data verification failures to support its argument that Commerce's final determination is unsupported by substantial evidence. APF Br. at 23-25. APF provides only a summary of what it alleges is Commerce's position in each instance and without a single record citation. *Id.* APF also includes in its chart what is titled "Response." *Id.* Absent a single record citation or further explanation, it is unclear whether "Response" constitutes responsive material APF has excerpted from the record or whether it is APF's belated explanations for the inconsistency or deficiency. For these reasons, the Court should not consider APF's arguments regarding its sales data because it is impractical, if not impossible, for the Government to respond to such imprecise allegations and material. Nevertheless, if the Court should consider APF's sales data arguments, we have attempted to identify the material and provide the Court with an adequate response.

APF contends that the warehouse costs it provided in its verification questionnaire response were "the exact same figures" it had reported in its sales database, and that it provided an explanation of how its warehouse costs were calculated.  APF Br. at 23.  But, as APF admits, the record shows that the total warehouse cost APF reported in its sales database does not match the information APF provided in its warehouse cost calculation worksheet at verification. *Compare* Second Supplemental Sections A-C Response, dated April 26, 2021 (SSQR) (P.R. 144) (C.R. 159-C.R. 167), (C.R. 160) Exhibit S2-20.b. (revised warehouse calculation), with ILOVQR (P.R. 221) (C.R. 266), (C.R. 266) at Exhibit S3-1.a (verification warehouse cost calculation).  Although APF now attempts to explain the difference, APF should have raised the discrepancy with Commerce when APF discovered the error.  Again, verification is a spot check and not an exhaustive reexamination of the respondent's practices.  Moreover, APF may have provided a narrative explanation for how it calculated warehousing expenses, *see* APF Br. at 23, but APF's warehouse costs did not reconcile at verification.  AFA Memo at 4.

APF also argues that Commerce erred in verifying its shipment dates.  APF Br. at 23-24.  Specifically, APF asserts that Commerce is "well aware that the dates reported under the date of shipment field (SHIPDATU) represent the date that the product left the factory," *id*. at 23-24, and that Commerce "knew very well that the bill of lading dates are not the date of shipment from the factory because Asia Pacific reported the bill of lading dates in field BLDATEU in the U.S. sales file." *Id*. at 24.  But Commerce did not attempt to reconcile the reported bill of lading dates as date of shipment, as APF suggests. *Id*.  Instead, Commerce sought to reconcile the date APF reported under the date of shipment field (SHIPDATU) for sales with documentation APF provided in its verification questionnaire response.  AFA Memo at 5.  In so doing, Commerce found that the dates APF reported under SHIPDATU (*i.e.*, date of shipment field) for its sales do

not match the shipment dates recorded in the documentation APF provided at verification. *Id.*; *see e.g.,* SSQR (P.R. 144) at APF U.S. Sales Database (C.R. 167) at SEQU [█]; ILOVQR (P.R. 221) (C.R. 267-C.R. 268), ILOVQR (C.R. 267) at SEQU [█] (shipment dates listed in documents provided at verification); and Sections B & C Response, dated January 28, 2021 (P.R. 76) (C.R. 29) at C-16 ("We have reported the date of shipment from APF's factory in th{e} {SHIPDATU} field."). Accordingly, Commerce explained that "Asia Pacific has failed to reconcile the shipment dates for all export sales with any supporting documentation." AFA Memo at 5. APF fails to cite any record evidence that contradicts Commerce's conclusion.

Next, APF argues that, contrary to Commerce's final determination, its reported indirect selling expenses reconcile with the supporting documentation it provided in its verification questionnaire response. APF Br. at 24. But APF's argument is undermined by its response. According to APF,

> {t}he figures on S3-1.a are identical to the indirect selling expenses reported in Exhibit S2-41 of the 2nd supplemental questionnaire response *except* **for the bifurcation of Marketing Expenses,** which were allocated to HM and export indirect selling expenses in Exhibit S2-41 *but inadvertently reported* **exclusively as HM indirect selling expense.**

*Id*. (emphasis added). In APF's own words, the figures do not reconcile and APF made an error. APF further contends that the "slight difference" was obviously in error, and that the error has no impact on the antidumping margin. *Id*. That verification failures do not impact the margin is irrelevant to the question of whether or not the data reported by a respondent is reliable and verifiable. Again, verification is a spot check for accuracy. Moreover, APF should have alerted Commerce to the error which, APF itself argues, "was obvious from the comparison of the two exhibits," when APF discovered the discrepancy. *Id*. APF's explanation here is untimely and its attempt to shift the blame to Commerce is unpersuasive.

APF also contends that Commerce erroneously referenced APF's reported sales value, rather than sales quantity, for home market sales of SEQH [███], and that the correct figure is supported by the documentation APF provided at verification. *Id*.  But APF never raised this alleged error with Commerce. *See* 19 C.F.R. § 351.224 *et seq*. (providing parties with the opportunity to raise ministerial error allegations to correct transcription errors made by Commerce following issuance of the final determination).  Although APF filed post-final determination comments opposing Commerce's AFA determination, it did not raise any ministerial errors.

Lastly, APF contends that the reported sales quantity for SEQU [███] reconciles with supporting verification documentation when taken together with a separate line item.  APF Br. at 24-25 (explaining that two separate line items on a sales invoice together derive the same figure reported for one line-item on the commercial invoice).  *Id*.  However, Commerce cautioned in the verification questionnaire:

> ***Due to the nature of this ILOV questionnaire, specifically that Commerce officials are not on-site, please make sure to err on the side of over inclusion.  Your sales traces must include a detailed narrative explanation for each step in the process, for each sales trace. Commerce officials should be able to follow the sales trace through from one page to the next, guided by annotations to the actual document submitted and a thoroughly detailed narrative description.***

Revised ILOVQ at 4-5 (emphasis in original).  APF fails to cite to any place in the record where it provided Commerce with an adequate sales trace.  APF Br. at 25.  If APF had included a detailed narrative explanation for each step, as it was instructed to do, and as it has seemingly done for the Court, APF would not be in the position of arguing that it was Commerce's responsibility to figure out how to reconcile a respondent's sales figures at verification. Regardless, APF fails to explain why it did not comply with Commerce's clear instruction to "err

on the side of over inclusion" and "include a detailed narrative explanation."  Revised ILOVQ at 4-5.  Again, it is not for Commerce to discern the derivation of APF's figures, especially at verification, which is a spot check for accuracy.

In sum, APF asks this Court to do what it cannot do – that is, reweigh record evidence. In addition to the five verification failures APF mentions in its brief, APF's verification responses also failed to reconcile with certain of APF's inventory carrying costs, packing figures, payment terms, sales' destination zip codes and state, quantity and value totals for home market sales, and the reported unit costs of inland freight, brokerage and handling, and international freight, and the payment and billing date for one U.S. sale.  AFA Memo at 2-6.  In some cases, APF failed to provide legible or translated supporting materials.  *Id*. at 1-2.  Although certain of APF's sales data verification failures arguably are "insignificant in nature," they signal a pattern of inconsistent, incomplete, and inaccurate reporting indicative of noncooperation.  Therefore, Commerce's determinations that it could not rely on APF's reported data and that APF failed to cooperate are supported by substantial record evidence of APF's sales and cost data inconsistencies, deficiencies, and reporting failures.  *Id*. at 6-7.

## CONCLUSION

For these reasons, we respectfully request that the Court deny APF's motion for judgment and sustain Commerce's final determination.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

/s/ Eric J. Singley
Eric J. Singley
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone:  (202) 616-1273
Facsimile:   (202) 307-0972
Email: Eric.j.singley@usdoj.gov

September 23, 2022                              *Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that this motion complies with the Court's type-volume limitation rules.  According to the word count calculated by the word processing system with which the brief was prepared, the public version of the brief contains a total of 13,586 words.


<u>s/ Eric J. Singley</u>

September 23, 2022